Andrew WHITE, Plaintiff,

v.

Milan PANIC, Weldon B. Jolley, Thomas H. Lenagh, Roberts A. Smith, Richard W. Starr, Andrei Kozyrev, Norman Barker, Jr., Birch E. Bayh, Jr., Alan F. Charles Adam Jerney, Stephen D. Moses, Roger Guillemin, Jean–Francois Kurz, Charles T. Manatt, Michael Smith and Inc Pharmaceuticals, Inc. Defendants.

Civ. A. No. 16800.

Court of Chancery of Delaware, New Castle County.

Submitted: Nov. 17, 1999.
Decided: Jan. 19, 2000.

Joseph A. Rosenthal, of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Irving Bizar, of Bizar, Martin & Taub, New York City, for Plaintiff.

Jesse A. Finkelstein, and Srinivas Raju, of Richards, Layton & Finger, Wilmington, Warren L. Dennis and Michael C. Hochman of Proskauer Rose, LLP, Washington, D.C., for Director Defendants.

Christian Douglas Wright, Young, Conaway, Stargatt & Taylor, LLP, Wilmington, Lawrence P. Eagel, Bragar Wexler Eagel & Morgenstern, New York City, for Defendant ICN Pharmaceuticals, Inc.

## OPINION

LAMB, Vice Chancellor.

### I. INTRODUCTION

In July 1998 *U.S. News and World Report* ran a cover story focusing on sexual harassment by CEOs. The article discussed the troubles facing ICN Pharmaceuticals, Inc., arising from alleged misconduct by Milan Panic, the company's founder and Chief Executive Officer. The story noted that numerous former ICN female employees had filed complaints of sexual harassment against Panic and that ICN had been sued by, and settled with, several of the aggrieved women.

After he and his lawyers read this article, Andrew White, a shareholder of ICN, filed a derivative complaint in November 1998, naming Panic and the other members of the ICN Board of Directors as defendants. White alleged that Panic breached his fiduciary duties to ICN shareholders by his alleged workplace sexual harassment. White further claimed that the other ICN directors breached their fiduciary duties by affirmatively taking steps that absolved Panic from responsibility for his behavior and by failing to implement proper control mechanisms.

The defendants have moved to dismiss on the grounds that (1) plaintiff failed to make a demand on the corporate board, as required by Court of Chancery Rule 23.1, and cannot provide a basis for excusing demand, and (2) the complaint fails to state a cognizable claim.

Having considered the parties' positions, as advanced in their briefs and at oral argument, I grant defendants' motion to dismiss pursuant to Rule 23.1. I do not, therefore, reach their contention that the complaint fails to state a claim upon which relief may be granted.

## II. FACTUAL BACKGROUND [1]

### A. The Parties

Plaintiff Andrew White is a shareholder of nominal defendant ICN, which manufactures and markets pharmaceutical products in over 90 countries. Its stock is traded on the New York Stock Exchange. ICN is the largest pharmaceutical company in Russia and Yugoslavia.

ICN's founder, Panic has been the company's Chairman of the Board and CEO since 1960. He was president of the company until 1997. Panic served as Prime Minister of Yugoslavia from 1992 to 1993.

The other ICN board members are Weldon B. Jolley, Thomas H. Lenagh, Roberts A. Smith, Richard W. Starr, Andrei Kozyrev, Norman Barker, Jr., Birch E. Bayh, Jr., Alan F. Charles, Adam Jerney, Stephen D. Moses, Roger Guillemin, Jean–Francois Kurz, Charles T. Manatt and Michael Smith (collectively, the "Director Defendants").

Of the fifteen member board, only Panic and Jerney, who is ICN's Chief Operating Officer and president, are employees. The complaint alleges additional facts about the outside directors, as follows: each of the other defendants "became directors at the explicit direction and request of defendant Panic"; Barker, Bayh, Moses, R. Smith, Charles and Manatt each serve on either the Compensation and Benefits Committee or the Corporate Governance Committee or both; Bayh or his law firm received legal or consulting fees from ICN of $33,440 in 1997; Guillemin, M. Smith, R. Smith, Charles and Moses received $75,000, $50,000, $12,000, $48,000 and $48,000, respectively, in consulting fees from ICN in 1997; and all directors annually receive ICN stock options.

### B. The *U.S. News and World Report* Article is Published

On July 6, 1998, *U.S. News and World Report* published a cover story entitled "Sex and the CEO." The article was published on the heels of decisions by the U.S.

---

1. The facts presented here are, generally, those alleged in the Complaint. Certain other facts are taken from the *U.S. News and World Report* article referred to in the complaint. Due to plaintiff's total reliance on the article as a source of information, I deem the article in its entirety to be incorporated into the Complaint. *See In re Santa Fe Pacific Corp. Shareholders Litig.*, Del.Supr., 669 A.2d 59, 69 (1995); *Lewis v. Straetz*, Del.Ch., Consol. C.A. No. 7859, mem. op. at 7–10, 1986 WL 2252, Hartnett, V.C. (Feb. 12, 1986).

Supreme Court articulating the standard for corporate-level liability for sexual harassment in the workplace.[2] The article focused on ICN, discussing several lawsuits filed against the company in connection with alleged sexual misconduct by Panic and ICN's response to those lawsuits.

After reviewing the article and consulting with his attorney, but without further investigation, the plaintiff filed this derivative complaint on November 23, 1998. The factual allegations in the complaint, with several limited exceptions,[3] are copied almost verbatim from the article.[4] Allegations not specifically stated in the article appear to be inferences drawn therefrom. As discussed below, the plaintiff's understanding of certain events appears to be at odds with the specific facts discussed in the article.

### C. The Facts Recited in the Article and the Complaint

In light of plaintiff's heavy reliance on the article, I simply quote those sections referred to or quoted in the complaint. I also quote several pertinent sections not mentioned in the complaint.

The article begins:

> Panic is ... a lightning rod for complaints of sexual harassment. Panic and ICN shareholders have paid out millions in settlements in four separate cases, and are at risk for millions more. At

least six women in the past five years have alleged that the 68–year–old, twice-married father of five has repeatedly propositioned or groped them and rewarded or punished female employees based on whether they complied or complained. Five of the women have filed discrimination charges with California's Department of Fair Employment and Housing. Four of those have sued ICN: One trial begins July 13. Yet far from ousting Panic, the board of directors has done all it can to protect him. In April, with two harassment suits still pending, the board sweetened his $644,680 salary with a $1.8 million bonus.

> ... Both Watt and Moses[5] say that Panic is an innocent victim of extortion. Women target him because of his high profile and wealth, they say; the company, consumed with its rapid global expansion, pays settlements as the only way to avoid bad publicity and the prolonged distraction and cost of litigation. "The courts are being abused," says Watt, "by these silly cases."

The article discloses, in particular detail, Panic's conduct that is alleged to constitute sexual harassment and reports that officials at ICN knew of the problem by July 1992, when a female employee complained to a corporate officer. According to the article:

---

**2.** Neither the article nor the complaint identifies the Supreme Court decisions regarding corporate liability for sexual harassment in the workplace. After brief research, it appears that the article referred to two cases decided on the same day: *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

**3.** The facts regarding director compensation and the collateral posted by Panic to secure

the $3.5 million loan, which is discussed below, were presumably obtained from one of ICN's public SEC filings.

**4.** At oral argument, plaintiff's counsel conceded that the article provided the sole basis for most of his client's factual assertions.

**5.** Watt was then ICN's general counsel and Moses is Stephen D. Moses, one of the Director Defendants.

ICN set its course: When a woman claimed harassment, the company would appease her and secure her silence but make no fundamental changes. That's how they responded to the first lawsuit, in May 1993.... Panic denied wrongdoing, but the company settled with [the plaintiff], requiring her to sign a confidentiality agreement.

The article notes that, according to one Director Defendant, the board first learned of the allegations against Panic when Debra Levy filed a harassment suit in January 1995, also claiming that Panic fathered her child. Soon after learning of the Levy suit, the board took action, as follows: [6]

The board ... formed a special committee to deal with harassment allegations ... against Panic—in the Levy case and all subsequent cases, the committee would ask David Watt and attorneys at the Proskauer Rose law firm, who had represented Panic and ICN for many years, to investigate and make a report to the board; the committee would then recommend a response.

ICN and Panic settled with Levy, reportedly for a payment of $3.6 million. According to the article, "[t]he board says it required Panic to pay the entire settlement ($3.6 million) himself, with a loan guaranteed from the company." [7] The article also reports the "Panic and ICN shareholders have paid out millions in settlements in four separate cases, and are at risk for millions more." No factual details of those settlements or the amounts paid by ICN are given.

The complaint appears to confuse the settlement of the Levy suit with settlements of other unidentified suits, including a "paternity suit" against Panic. It also mixes up the article's reference to "millions" paid by Panic and ICN with the $3.5 allegedly paid to settle the Levy case, to arrive at an allegation that ICN has paid approximately $3.5 million in eight settlements. Finally, it treats the ICN loan guarantee (approximately $3.6 million) as being unrelated to the settlement of the Levy suit. As a result of this confusion, the complaint alleges, variously, the following:

To date, eight such settlements have been publicly revealed with payments totaling approximately $3,500,000, exclusive of attorneys' fees and costs. (Comp.¶13)

The Company has spent millions of dollars of its own resources to settle claims of employees victimized by Panic. In one instance, Panic was involved in a paternity suit brought by a former employee which was settled for more than $3,500,000. In June 1996, the Company made a short-term loan to Mr. Panic in that amount to enable Panic to settle the paternity suit. Although Panic repaid the loan in August 1996, he did so with the proceeds of a loan from a third-party bank guaranteed by ICN. (Comp.¶18)

The facts reported in the article do not bear the interpretation given to them by plaintiff. Rather, the article implies that ICN required Panic to pay for the settlement of the Levy suit and loaned him the money to do so. The article does not support the assertion that there was some other "paternity" suit settled by Panic us-

**6.** Plaintiff argues that the board must have known prior to 1995 about the problems but offers no proof as to this conclusion.

**7.** Although the article states that the settlement amount was $3.6 million, the complaint

continually uses $3.5 million as the total amount of the settlements to date. As such, the remainder of this Opinion will refer to the $3.5 million total.

ing ICN's money. Finally, while the article does report that ICN has spent "millions" settling claims, the only dollar figure reported relates specifically to the Levy suit.

After divulging further allegations of Panic's troubling conduct, the article next discusses another harassment trial then set to begin in July 1998:

> Most crucial to the trial's outcome will be whether ICN can convince the jury that[,] as a company, it behaved well: that it tried to prevent harassment, that it encouraged reporting and provided credible protection from retaliation, and that it was assiduous and neutral in its investigation and remedy of claims. In this it faces several obstacles.... They'll also have to account for the absence, conceded in directors' depositions, of any efforts to sanction Panic so that the claims of harassment would stop. Panic himself testified that he didn't recall ever being talked to or reprimanded.

The article pointed out that although 12,000 of ICN's 17,000 employees were women, there were no female board members and few women in "high-level" positions. In response to the perceived institutional problems, the article stated that ICN "has created a grievance committee, made up of middle managers. But last year, ICN further reinforced its policy of keeping complaints quiet by introducing a mandatory arbitration agreement; employees can no longer sue or appeal, and all proceedings will be sealed."

The final point noted in the article that is relevant to my analysis on this motion is that "Panic has never been legally found to have engaged in sexual harassment.... Even if it were established that Panic had engaged in harassment, companies with an individual of such essential value as Panic face a dilemma. Moses repeatedly stressed his 'fiduciary duty' to ICN shareholders, suggesting that duty was best served by not creating any trouble for Panic."

## D. The Complaint is Filed

The article unquestionably reflects the existence of substantial evidence for use in a sexual harassment claim against Panic and, to a far lesser extent, the company. The issue facing plaintiff, however, is whether the article provides a sufficient basis for a claim against Panic or the Director Defendants for breach of fiduciary duty. Plaintiff's theory of wrongdoing advanced in response to this motion has been fluid and changing. Thus, it is useful in determining whether any claim survives this motion to clarify the nature of the claims alleged.

In its first paragraph, the complaint describes the gravamen of the action as concerning the following:

> Violations of the Federal Civil Rights Act and applicable state law, more fully described below; the responsibility of defendant Milan Panic for such violations; *and the inexcusable, sustained and systematic failure by the members of ICN's Board of Directors to prevent such violations from occurring and to shield ICN from harm therefor.*

(emphasis added). Notwithstanding the suggestive language of this allegation, plaintiff is quite clear in connection with the pending motion that this is not a "failure to monitor" case. That is, the Director Defendants are not alleged to have "hidden their heads in the sand" instead of addressing a source of potential liability.[8]

---

**8.** Such a theory of liability is discussed in former Chancellor Allen's opinion in *In re Caremark Int'l, Inc. Deriv. Litig.,* Del.Ch., 698 A.2d 959 (1996) and the Delaware Supreme Court's opinion in *Graham v. Allis–Chalmers Mfg. Co.,* Del.Supr., 188 A.2d 125 (1963).

Rather, plaintiff claims that the Director Defendants are liable for their *affirmative and intentional decisions* allegedly reached in bad faith or with a reckless disregard of their fiduciary duties.

The wrong, according to plaintiff, is that the Director Defendants *condoned and encouraged* Panic's unlawful conduct by: (1) settling lawsuits against ICN without requiring Panic to reimburse the company; (2) awarding a $1.8 million bonus to Panic; (3) implementing a corporate policy of mandatory and sealed arbitration to address employee complaints; (4) providing a loan and subsequent guarantee in connection with Panic's settlement of a lawsuit; and (5) requiring insufficient collateral to secure that guarantee.

Although plaintiff attacks this series of decisions taken by the Director Defendants, the complaint provides little or no detail of what, exactly, the Director Defendants are claimed to have done. This is because the article contained little factual detail about the board's activities and the complaint does little more than parrot the article. Instead of providing contextual information, the complaint launches a broadside attack on the actions of the ICN board and asks me to infer, due only to the nature of the underlying conduct charged to Panic, that the actions taken by the Director Defendants are not entitled to business judgment rule protection.

## III. DISCUSSION

In considering a motion to dismiss under Chancery Court Rule 23.1 for failure to make a presuit demand, as is true in the case of a motion to dismiss under Court of Chancery Rule 12(b)(6), the Court confines its attention to the face of the complaint.[9] Moreover, "all facts of the pleadings and reasonable inferences therefrom are accepted as true, but neither inferences nor conclusions of fact unsupported by allegations of specific facts upon which the inferences or conclusions rest are accepted as true."[10] This court "need not blindly accept as true all allegations, nor must it draw all inferences from them in plaintiffs' favor unless they are reasonable inferences."[11]

### A. The Demand Requirement Generally

Corporate directors are empowered to determine whether to bring suit on behalf of the corporation.[12] A derivative plaintiff seeks to displace the board in one of its customary managerial roles. "By its very nature the derivative suit impinges on the managerial freedom of directors."[13] As such, a plaintiff's pleading burden under Rule 23.1[14] is "more onerous than that required to withstand a Rule 12(b)(6) motion to dismiss."[15]

To bring suit on behalf of the corporation, "stockholder plaintiffs must

9. *But see* note 1, *supra.*

10. *Grobow v. Perot,* Del.Supr., 539 A.2d 180, 187, n. 6 (1988) (citations omitted).

11. *Grobow,* 539 A.2d at 187 (footnote omitted).

12. 8 *Del. C.* § 141.

13. *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 811 (1984).

14. Court of Chancery Rule 23.1—Derivative actions by shareholders:

> In a derivative action...the complaint shall allege ... with particularity the efforts, if any, make by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort.

15. *Levine v. Smith,* Del.Supr., 591 A.2d 194, 207 (1991) (citing *Grobow,* 539 A.2d at 187, n. 6).

overcome the powerful presumptions of the business judgment rule before they will be permitted to pursue the derivative claim."[16] The purpose for the demand requirement and concomitant heightened pleading standard is to "effectively distinguish between strike suits motivated by the hope of creating settlement leverage through the prospect of expensive and time-consuming litigation discovery and suits reflecting a reasonable apprehension of actionable director malfeasance that the sitting board cannot be expected to objectively pursue on the corporation's behalf."[17] The key to the demand futility analysis is whether "the directors are incapable of making an impartial decision regarding [prosecution of] such litigation."[18]

## B. The Aronson Test For Excusing Demand

■ In *Aronson v. Lewis*,[19] the Delaware Supreme Court established a two-prong test for determining when the making of a demand on the corporate board would be excused for purposes of Rule 23.1.[20] A stockholder seeking to sue derivatively without first making a demand upon the board must allege with particularity facts sufficient to create a reasonable doubt that (a) a majority of the directors are disinterested and independent, or (b) the challenged transaction is otherwise the product of the directors' valid exercise of business judgment.[21] If either prong is satisfied, the Court will infer that the board of directors is incapable of exercising its authority to pursue the derivative claims directly and the objecting shareholder will be allowed to pursue the derivative claim notwithstanding the failure to make a presuit demand.[22]

## C. The Delaware Supreme Court Has Urged Shareholders to Use the "Tools At Hand," Including § 220 Actions, To Obtain Information Necessary To Sue Derivatively

For all of its colorful language, what is missing from the complaint, in terms of the details of actions taken by the Director Defendants, is at least as important as what is alleged. Plaintiff might have avoided this problem by conducting the independent presuit investigation recommended by the Supreme Court in *Rales v. Blasband*.[23] Because he did not, I will not give a broad reading to the facts alleged in the complaint, nor will I infer from them the existence of other facts that would have been proved or disproved by a further presuit investigation.

More than eight years ago, in *Rales*, the Court recognized the difficulty plaintiffs face in satisfying the particularization requirement of Rule 23.1, stemming from the unavailability of discovery in order to bolster the facts alleged in the complaint.[24] The Supreme Court suggested that plaintiffs gather information by using public sources available to all, including the me-

16. *Rales v. Blasband*, Del.Supr., 634 A.2d 927, 933 (1993).

17. Donald J. Wolfe & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 9–2(b)(3)(i), 554 (1998) (hereinafter "Wolfe & Pittenger").

18. *Rales*, 634 A.2d at 932.

19. Del.Supr., 473 A.2d 805 (1984).

20. *Id.* at 814.

21. *Id.*

22. *See Heineman v. Datapoint Corp.*, Del. Supr., 611 A.2d 950 (1992).

23. 634 A.2d at 934–35, n. 10.

24. *Id.*

dia and SEC disclosure documents.[25] The Court also noted that a shareholder who "has shown a specific proper purpose may use the summary procedure embodied in 8 *Del. C.* § 220 to investigate the possibility of corporate wrongdoing."[26] The Court expressed surprise that "little use has been made of section 220 as an information-gathering tool in the derivative context." As the Court observed, the "first to file" custom that is applied in the derivative lawsuit context might explain the tendency to disregard the availability of that useful, yet sometimes time consuming, method of gathering information.[27]

In the case at hand, there was plainly no "race to the courthouse." The article was published in July 1998 and the complaint filed the following November. Despite ample opportunity to exercise self-help, plaintiff relied more or less exclusively on the matters reported in that article in drafting his complaint. Further investigation into the basic facts involved was both warranted and possible.

■ Plaintiff's answering brief cites authority to the effect that a derivative plaintiff may rely on the truthfulness of reports published by reputable media in verifying information alleged in his or her complaint.[28] While Court of Chancery Rule 23.1, unlike its federal counterpart, does not require that derivative complaints be verified, I agree that counsel may rely on factual information found in investigative reports published in leading periodicals. This principle, however, is limited and hardly relieves a plaintiff of the responsibility addressed in *Rales* of using the "tools at hand" to engage in further investigation needed to flesh out the matters reported upon. In this case, it is apparent at every turn that more information could and should have been obtained bearing on the actions taken by the Director Defendants and the impact of those actions on ICN. Information gained by means of a request to inspect corporate books or records might have led to the facts justifying an inference that the Director Defendants reached their conclusions because of considerations other than stockholder interest. Of course, such further investigation might also have led plaintiff and his counsel to abandon their claim or to acknowledge that demand was not excused.

### D. Is Demand Excused?

#### 1. Are the Director Defendants Disinterested and Independent?

At oral argument, plaintiff made no effort to claim that demand should be excused on the basis of the Director Defendants' self-interest or lack of independence,[29] relying, instead, on the second prong of the *Aronson* test. Neverthe-

---

**25.** *Id.*

**26.** *Id.* (citation omitted).

**27.** *Id.; see also Security First Corp. v. U.S. Die Casting and Development Co.*, Del.Supr., 687 A.2d 563, n. 3 (1997) (quoting *Rales v. Blasband*, Del.Supr., 634 A.2d 927, 934–935 n. 10); *Grimes v. Donald*, Del.Supr., 673 A.2d 1207, 1216 (1996).

**28.** *Lewis v. Curtis*, 671 F.2d 779, 787–88 (3d Cir.1982), *cert. denied*, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982). Although the above proposition has continued vitality, the analysis of *Lewis*, applying federal law instead

of state law in construing whether demand was excused, was abrogated by *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991).

**29.** At oral argument, plaintiff's counsel stated that he would not argue the points made in his brief. Yet, the only reference to independence in the brief appears *in a footnote*, stating that "[f]or purposes of defendants' motion, plaintiff does not rest his position with respect to the first prong of *Aronson* on the particularized allegations of the Complaint showing that at least a majority of ICN's directors [lacked independence] because of

less, I have examined the well-pleaded allegations of the complaint under the first prong of *Aronson* and am satisfied that demand should not be excused on that basis.

■ The complaint does not allege that (other than Panic) the Director Defendants—13 out of 15 of whom are "outsiders"—had any financial interested in the underlying transactions.[30] Under *Aronson*, however, I must also determine "whether the remaining [ICN] directors are sufficiently independent to make an impartial decision" if presented a stockholder demand.[31]

The complaint attacks the Director Defendants' independence as a group by alleging that Panic was responsible for securing the appointment of each of them as a director. Of course, the law is well-settled that Panic's involvement in selecting each of the directors is insufficient to create a reasonable doubt about their independence.[32] Similarly, the fact that each is paid an annual retainer of $30,000 plus a fee of $1,000 for each meeting attended and annual grants of stock options does not make them beholden to Panic.

No other claims of lack of independence are made as to seven of the thirteen "outside" directors. Of the remaining six, former United States Senator Birch Bayh, Jr., or "the law firm with which he is affiliated, received legal or consulting fees from ICN in the amount of $33,440" in 1997. The other five are alleged to have been paid consulting fees by ICN in 1997 as follows: R. Smith, $12,000; Charles, $48,000; Moses, $48,000; M. Smith, $50,000; and Guillemin, $75,000.

The allegations as to Bayh and R. Smith are insufficient to create a reasonable doubt about their independence. Although it has been held that a director whose small law firm received $1,000,000 in legal fees from the corporation was potentially beholden to the CEO,[33] the plaintiff has not alleged particular facts indicating that $33,440 allegedly paid to Bayh or his firm was so material as to taint Bayh's judgment as a director. For similar reasons, the payment of a $12,000 consulting fee to R. Smith does not, taken alone, create a reasonable doubt about his independence.[34]

I find it unnecessary to decide the issue raised regarding the consulting fees paid to Guillemin, M. Smith, Charles and Moses. Although the amounts alleged ($75,-000, $50,000, $48,000 and $48,000, respectively) are relatively large, the complaint contains no allegations of fact tending to show that the fees paid were material to these outside directors. Nevertheless, even if I were to assume that a consulting fee of $48,000 or more is sufficiently substantial to create a reasonable doubt that the director/consultant cannot act independently of the person controlling the pay-

their ties to and dependence on Panic's good will." Pl. Ans. Br. at n. 6. From this, I conclude that plaintiff has chosen not to rely on any allegation of lack of directorial independence in resisting this motion.

30. Instead, plaintiff states that the "substantial likelihood that each of the defendants is liable to ICN" provides a disqualifying interest for demand purposes. This theory of interest is properly considered in the context of the second prong, discussed *infra*.

31. *Rales*, 634 A.2d at 936.

32. *Aronson*, 473 A.2d at 816.

33. *See Steiner v. Meyerson*, Del.Ch., C.A. No. 13139, mem. op. at 24–25, 1995 WL 441999, Allen, C. (July 18, 1995).

34. *See In re the Walt Disney Co. Deriv. Litig.*, Del. Ch., 731 A.2d 342, 360 (1998) (holding that consulting fees of $50,000 paid to an outside director, without an allegation that $50,000 was material to that director, did not render that director "beholden" to the company's CEO), *appeal docketed*, Del.Supr., No. 469, 1998 (Nov. 4, 1998).

ment of that fee,[35] only a total of six out of fifteen ICN directors would be disqualified for demand purposes.[36] Thus, I conclude that the complaint does not create a reasonable doubt that a majority of the Director Defendants would sue Panic, if they perceived doing so to be in ICN's best interest.

Also, I note that the issue of the disinterest and independence of ICN's directors was recently addressed by United States District Court for the Central District of California, applying Delaware law, in dismissing a derivative litigation filed against ICN and its directors. The court in that case held that the facts alleged in that case failed to raise a reasonable doubt that at least eight (and perhaps as many as 10) of the 15 board members [37] were sufficiently disinterested or independent to show demand futility.[38]

### 2. Is there a Reasonable Doubt that Any Challenged Decision Was the Product of Valid Exercise of Business Judgment?

▆▆▆ The second prong of the *Aronson* test is directed at the substance of the challenged conduct or transaction.[39] Where, as is the case here, the complaint fails to allege facts excusing demand under the first prong, plaintiff "must plead facts creating a reasonable doubt as to the 'soundness' of the challenged transaction sufficient to rebut the presumption that the business judgment rule attaches to the transaction." [40] In the circumstances, plaintiff faces "a heavy burden ... to avoid presuit demand." [41]

Plaintiff's argument under the second prong boils down to a charge that the Director Defendants reacted improperly to evidence of Panic's sexual misconduct. As I have discussed, the complaint supplies little actual information about either the context underlying the challenged decisions or the process followed by the Director Defendants in reaching them. Instead, the complaint is replete with highly moralistic, conclusory charges of misconduct, including for example, that the Director Defendants "turn[ed] a blind eye to the hostile work environment" created by Panic and "permitt[ed] Panic to escape

---

**35.** The complaint does not allege that Panic controlled or had significant authority with regard to the various consulting fees.

**36.** Panic is disqualified. A doubt exists as to Jerney (due to his status as an employee) and may apply to Guillemin, M. Smith, Charles and Moses (due to their receipt of substantial consulting fees). Plaintiff cites *Friedman v. Beningson*, Del.Ch., C.A. No. 12232, 1995 WL 716762, Allen, C. (Dec. 4, 1995), arguing that $48,000 in consulting fees establishes a disqualifying interest. In that case, Chancellor Allen held that the $48,000 fee, *in conjunction with the other facts supporting a finding that the director was beholden* (to a controlling shareholder who clearly exercised managerial control of the corporation and its board), created a reasonable doubt. *Id.* at 10–12. It is not clear that the $48,000 alone would have warranted the same result.

**37.** The eight directors whom the District Court held were undoubtedly disinterested

and independent were: Barker, Kurz, Lenagh, Manatt, M. Smith, Charles, Moses and Starr. The Court also held that despite consulting fees of $28,000 and $27,732, respectively, Jolley and Guillemin were also sufficiently independent so that they could objectively respond to a stockholder demand.

**38.** *See generally In re ICN Pharmaceuticals, Inc. Securities Litig.*, No. SA CV 95–0128 GLT (C.D.Cal. Apr. 15, 1995) (Order Granting Defendants' Motion to Dismiss Second Amended Derivative Complaint).

**39.** *Aronson*, 473 A.2d at 814.

**40.** *Levine v. Smith*, 591 A.2d 194, 205–06 (1991).

**41.** *Grobow*, 539 A.2d at 190.

scot-free, notwithstanding his scandalous and repugnant misconduct." At oral argument, plaintiff's counsel was unable to put much flesh on these bones, summing up his argument as follows: "I submit that at least on the face of this, to authorize eight settlements, to be parties to four pending litigation ... to be subject of an investigation and yet not to require Mr. Panic to pay anything, but to keep giving him more and more money, ... is not a valid exercise of business judgment."

■ My review of the totality of the Director Defendants' conduct, as gleaned from the complaint and the magazine article on which it is based, leads to the conclusion that the complaint does not satisfy the second prong of the *Aronson* test and, thus, that demand is not excused. That ICN was sued, settled some of the suits and (as is claimed) chose not to seek contribution from the alleged perpetrator does not provide a sufficient basis to infer bad faith conduct on the part of the Director Defendants. Nor does plaintiff's conclusory allegation that the Director Defendants were improperly motivated as part of a "conscious scheme" to protect Panic. Mere "[s]peculation on motives for undertaking corporate action are wholly insufficient to establish a case of demand excusal." [42]

Rather, the totality of facts properly alleged (or appearing in the article) does not give rise to a reasonable doubt that the Director Defendants' actions in relation to the allegations of sexual harassment surrounding Panic and ICN are entitled to the protection of the business judgment rule. In January 1995, upon learning about complaints against Panic, the ICN board of directors created a special committee (comprised of directors whose identities are not revealed by the complaint).

The special committee hired reputable counsel "to investigate and make a report to the board." In July 1996, the Director Defendants approved a settlement of one of the cases for $3.5 million and "required Panic to pay the settlement himself with a loan guaranteed by the company." Other cases have also been settled, although no details are alleged in the complaint or reported in the article. In July 1997, in view of the "current litigation environment," the special committee "advised, 'management should take a much more active approach in enforcing its sexual harassment procedures and policies.'" The company has also created a grievance committee and introduced a "mandatory" arbitration agreement with confidential proceedings.

Weighing against these facts are graphically detailed information about Panic's misbehavior, charges from which it might be inferred that the board of directors tried to ignore his misconduct, and reported concessions by one or more unnamed directors that they have not sanctioned Panic to cause him to stop. There are also facts alleged from which one might infer that the Director Defendants protected Panic due to ICN's heavy reliance on him in generating business and profits. For example, the complaint makes much of the fact that in April 1988, the Director Defendants awarded Panic a bonus of $1.8 million "over and above his handsome salary."

These challenges to actions taken by the Director Defendants do not, separately or together, give rise to a reasonable doubt about the directors' valid exercise of business judgment. I will discuss each in turn.

### a. Not compelling Panic to pay for the costs caused by the suits

■ Plaintiff's counsel agreed during oral argument that a decision to settle

---

42. *Grobow,* 539 A.2d at 188.

suits against ICN would not typically give rise to director liability.[43] Plaintiff's contention, however, is that Panic should have been required to compensate ICN for the costs incurred in defending claims of sexual harassment because "the nature and seriousness of the sexual harassment claims inspired by Panic's offenses giving rise to the settlements" warrants application of a different standard. While the claims against Panic are obviously serious and troubling, I cannot agree that their inherent nature alters the board's role in determining how and when to address claims against the company.

Moreover, plaintiff's argument ignores the essence of a litigation *settlement*. Simply put, the complaint does not reveal that Panic has admitted wrongdoing or that any court has held him liable for sexual harassment. Indeed, the article at least reflects ICN's (and Panic's) position that the suits are without merit. The decision to settle the suits without seeking contribution by Panic (even if properly alleged) is squarely a matter for the disinterested and independent majority of ICN directors to decide.[44]

Finally, I note that the complaint contains almost no information about the settlements authorized by the ICN board of directors. Similarly, to the extent that the complaint suggests or alleges that there were two separate settlements each for $3.5 or $3.6 million, the article does not support the charge. Indeed, the complaint does not even allege the status or disposition of the case that was reported to be going to trial in July 1998. These bare allegations hardly support an inference that the business judgment rule does not apply.

### b. Awarding a $1.8 million bonus

 Plaintiff alleges nothing beyond the amount of the bonus paid and that the Director Defendants have not required Panic to reimburse the company for its costs in responding to complaints about his sexually harassing conduct. Even if I assume that the board paid Panic the same bonus it would have paid him had none of these suits been filed, I cannot infer that the bonus was awarded in bad faith. Except for cases involving allegations of fraud, "this Court's deference to directors' business judgment is particularly broad in matters of executive compensation."[45]

### c. Implementing mandatory sealed arbitration for resolving employee complaints

 Plaintiff argues that the Director Defendants "have overstepped the broad reach of protected business judgment with unacceptable, egregious decisions calculated to maintain, if not promote, continued violations of Federal and State laws by Panic." Further, plaintiff states, "ICN's directors have promoted an atmosphere for continued sexual harassment in ICN's executive offices by consigning victims to mandatory arbitration shrouded in secrecy."

The complaint makes no effort to explain why plaintiff's view of the effect or

---

43. See, e.g., Perrine v. Pennroad Corp., Del. Supr., 47 A.2d 479, 487–88 (1946) ("In the settlement of disputes in which corporations are interested, the Directors of the Corporation ... are called upon to exercise honest business discretion.... [Directors], as a general rule, are chosen by a majority of the stockholders for that purpose.").

44. See Caremark, 698 A.2d at 967–68 ("[S]o long as the court determines that the process employed was either rational or employed in *a good faith* effort to advance corporate interests," a substantively wrong decision will not provide the basis for directorial liability).

45. Disney, 731 A.2d at 362.

intent of the Director Defendants' decisions is correct or even plausible. The decision to implement the challenged policy is presumably the product of a deliberative process. It is reasonable to infer from the article that it was based on legal advice received from counsel retained to advise the special committee and the company about issues of sexual harassment in the workplace.[46] Plaintiff does not explain either how the policy implemented is deficient as a matter of law,[47] or how addressing employee complaints in a sealed proceeding is inherently wrongful. In the circumstances, no inference of bad faith or improper purpose can be drawn from the implementation of this policy.

### d. Providing Panic with the loan and guarantee

■■■ Plaintiff challenges the loan and guarantee arrangement on the grounds that it "significantly lessened Panic's financial pain from a very costly misstep with a subordinate employee." Underlying the sadistic overtone of plaintiff's position may be a misunderstanding of the facts. Plaintiff alleges that the settlement refers to a paternity suit against Panic individually. My reading of the article leads me to conclude that the loan and guarantee arose out of the settlement of the Levy suit, in which both Panic and ICN were defendants. The article also states that ICN made Panic pay the settlement "himself." This implies to me that the settlement was made by all defendants and that the Director Defendants insisted on Panic's payment of the entire settlement amount.

In any event, the complaint does not, in this regard, create a reasonable doubt that the Director Defendants acted disloyally in choosing not to punish the company's CEO.[48] The Director Defendants' duty is solely to ICN's stockholders. To successfully challenge the decision not to punish Panic for causing ICN to incur costs, plaintiff must allege facts indicating that the failure to punish was due to a consideration of interests other than those of ICN and its stockholders. He has not done so, and I am unwilling to draw an inference of improper motivation from the sparse allegations of the complaint.

### e. Not obtaining sufficient collateral to secure the guarantee

■■■ The Director Defendants required Panic to deposit 150,000 options to purchase ICN stock at an exercise price of $15.17 per share as collateral for ICN's guarantee of his obligation to repay the $3.5 million loan. The complaint does not allege that these options were worthless and did not provide some measure of security for ICN's guarantee. Nor does it allege that Panic did not remain liable on the loan and, in the event ICN was required to perform on its guarantee, liable to ICN under normal legal principles. In the circumstances, the requirement that Panic post collateral on the guarantee pro-

---

**46.** The article specifically noted that the board employed Proskauer Rose LLP to advise it on addressing the employee complaints. Also, plaintiff is not claiming that the Director Defendants were inadequately informed with respect to the matters.

**47.** Plaintiff might have done so by examining relevant precedent, including the U.S. Supreme Court opinions mentioned in the article. Theoretically, plaintiff could argue that the board does not in good faith believe that the implemented policy will protect ICN from liability arising out of workplace sexual harassment, if and when ICN is sued.

**48.** I make this statement with reference only to the settlements referred to in the complaint. As the cost of Panic's alleged behavior rises, the board should consider, as it does when examining any other cost of operating the corporation, the stockholders' best interests.

vided ICN with more, not less, security and the judgment of the directors in fixing the amount of that collateral does not support any inference of improper motivation on their part.

### f. Failure to supervise

■ Despite the recitation in the complaint of the "sustained and systematic failure" to supervise standard, plaintiff made clear in briefing and at oral argument that this case is not a "failure to supervise" case such as is discussed in former Chancellor Allen's *Caremark* opinion.[49] Plaintiff's argument is likely motivated by two factors.

First, the Supreme Court has stated that "requiring demand in [failure to monitor] cases is consistent with the board's managerial prerogatives because it permits the board to have the opportunity to take action where it has not previously considered doing so." Second, the Supreme Court in *Rales* made clear that where a demand is not made and the directors have not exercised their business judgment (due to an alleged failure to monitor) the inquiry is simply whether a reasonable doubt exists that "as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."[50]

Perhaps most importantly, under the standard discussed in *Caremark*, the Director Defendants would face a substantial likelihood of liability only if plaintiff alleged facts showing a "lack of good faith as evidenced by sustained or systematic failure ... to exercise reasonable oversight."[51] Both the complaint and the article on which it relies show that the Director Defendants were aware of the harassment claims at issue for several years, sought expert advice relating to those claims and addressed themselves to various issues related to that subject.

The defendants have responded to the *Caremark* claim as follows: "Simply put, the *Caremark* factors are inapplicable here because plaintiff fails to allege the absence of the kinds of internal controls to which the Court looked in *Caremark*. Nor has the Complaint alleged—*beyond the limited Panic-related allegations*—the presence of a company-wide sexual harassment problem or hostile work environment necessary *even to put Directors 'on notice' of a need* for corrective action." (emphasis added).

Defendants correctly assert that this complaint, accepted as true, has not satisfied the high standard enunciated in *Caremark*.[52] Defendants' further assertion that they are not "on notice" of a need for corrective action, however, concerns me because defendants appear to rely on an interpretation of *Graham v. Allis–Chalmers Mfg. Co.*[53] that was discredited in *Caremark*. Demand is not excused here only because the allegations of the complaint show that the board has *responded* to this perceived threat, not because the threat does not exist.

## IV. CONCLUSION

For the foregoing reasons, I conclude that plaintiff has failed to allege with particularized facts a basis upon which to find that demand upon the board would have been futile. As demand is not excused, defendants' Motion to Dismiss is hereby

**49.** Del.Ch., 698 A.2d 959 (1996).

**50.** 634 A.2d at 934.

**51.** *Caremark*, 698 A.2d at 971.

**52.** 698 A.2d at 970–72.

**53.** Del.Supr., 188 A.2d 125 (1963).

GRANTED, with prejudice, costs to the defendants. IT IS SO ORDERED.