# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DAVID SHABBOUEI, Derivatively on Behalf of LULULEMON ATHLETICA INC., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | **C.A. No. 2018-0847-JRS** |
| LAURENT POTDEVIN, GLENN MURPHY, MARTHA A.M. MORFITT, DAVID M. MUSSAFER, STUART HASELDEN, MICHAEL CASEY, EMILY WHITE, ROBERT BENSOUSSAN, KATHRYN HENRY, JON MCNEILL, TRICIA PATRICK, and STEVEN J. COLLINS, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| LULULEMON ATHLETICA INC., a Delaware Corporation, | ) ) ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted:  January 22, 2020
Date Decided:  April 2, 2020

Blake A. Bennett, Esquire of Cooch and Taylor, P.A., Wilmington, Delaware and Brian J. Robbins, Esquire, Stephen J. Oddo, Esquire and Steven R. Wedeking, Esquire of Robbins Arroyo LLP, San Diego, California, Attorneys for Plaintiff David Shabbouei.

Bradley R. Aronstam, Esquire and Roger S. Stronach, Esquire of Ross Aronstam & Moritz LLP, Wilmington, Delaware and Joseph S. Allerhand, Esquire, Stephen A. Radin, Esquire and Thomas G. James, Esquire of Weil, Gotshal & Manges LLP, New York, New York, Attorneys for Defendants Laurent Potdevin, Glenn Murphy, Martha A.M. Morfitt, David M. Mussafer, Stuart Haselden, Michael Casey, Emily White, Robert Bensoussan, Kathryn Henry, Jon McNeill, Tricia Patrick and Steven J. Collins and Nominal Defendant lululemon athletica inc.

**SLIGHTS, Vice Chancellor**

After verifying reports that its CEO had engaged in pervasive misconduct, the board of directors (the "Board") of lululemon athletica inc. ("lululemon" or the "Company") elected to pursue a negotiated separation of his employment rather than a termination for cause. The Board made this judgment after consulting extensively with outside counsel and meeting as a Board several times over the course of three months. The agreement negotiated by the Board called for severance payments to the CEO totaling $5 million.

A lululemon stockholder has brought a derivative complaint on behalf of the Company against the Board members in which he alleges they breached their fiduciary duties by rushing to pay an excessive severance fee to facilitate the CEO's separation as a means to cover up their slow response to his well-documented malfeasance.[1] In other words, Plaintiff alleges the Board acted *too slowly* in uncovering and responding to the CEO's misdeeds, but then acted *too quickly* in deciding to negotiate a separation with the CEO rather than fire him outright.

Many of the allegations in the operative complaint read like the ingredients of a *Caremark* claim.[2] That is, it appears Plaintiff seeks to hold the Board liable for not responding to "red flags" that the CEO was behaving in a manner detrimental to

---

[1] The complaint was filed after plaintiff demanded and received books and records from the Company under 8 *Del. C.* § 220.

[2] *In re Caremark Int'l, Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996).

1

the Company. Notwithstanding the several "failure of oversight" allegations that appear throughout the complaint, however, Plaintiff disavows any attempt to plead a *Caremark* claim. Instead, he maintains that he seeks to hold Defendants liable only for their *affirmative decision* to enter into a separation agreement with the CEO. Under this umbrella, he claims: (i) the Board was "self-interested" in the agreement because the agreement was an artifice designed to shield the Board members from oversight liability; (ii) the decision to sign the agreement was not a product of valid business judgment; or (iii) the decision to settle with the CEO, rather than fire him "for cause," constituted waste.

Defendants have moved to dismiss the complaint under Court of Chancery Rule 23.1.[3] Plaintiff did not demand that the Board pursue the claims he now brings derivatively, and Defendants maintain he has failed to plead demand futility with the particularity required by our law.

The Company has adopted an exculpatory clause in its certificate of incorporation.[4] Thus, to plead demand futility, Plaintiff must plead with particularity that the Board members breached their fiduciary duty of loyalty, either by executing the separation agreement to advance their own interests at the expense of the

---

[3] D.I. 19.

[4] 8 *Del. C.* § 102(b)(7).

2

Company, or by acting in bad faith. As explained below, the complaint falls well short of this mark. The motion to dismiss must be granted.

## I. FACTUAL BACKGROUND

I draw the facts from the allegations in the Verified Stockholder Derivative Amended Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment (the "Complaint"),[5] documents incorporated by reference or integral to that pleading and judicially noticeable facts.[6] For purposes of this motion to dismiss (the "Motion"), I accept as true the Complaint's well-pled factual allegations and draw all reasonable inferences in Plaintiff's favor.[7]

### A. Parties and Relevant Non-Parties

Nominal Defendant, lululemon, is a Delaware corporation.[8] The Company's business is to design, distribute and sell athletic apparel.[9] For the fiscal year ended

---

[5] Verified S'holder Deriv. Am. Compl. for Breach of Fiduciary Duty, Waste of Corp. Assets, and Unjust Enrichment ("Compl.") (D.I. 17).

[6] *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (quoting *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 69 (Del. 1995)) (noting that on a motion to dismiss, the court may consider documents that are "incorporated by reference" or "integral" to the complaint); D.R.E. 201–02 (codifying Delaware's judicial notice doctrine).

[7] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002).

[8] Compl. ¶ 12.

[9] *Id.*

February 3, 2019, the Company generated ~$3 billion in annual revenue and employed ~15,700 people.[10]

Plaintiff, David Shabbouei, was a lululemon stockholder during the relevant events alleged in the Complaint and has remained a stockholder since.[11] He purports to bring his Complaint derivatively on behalf of the Company.[12]

Defendant, Laurent Potdevin, served as lululemon's CEO from 2014 to February 5, 2018.[13] Non-party, Sunita Linde, was employed as a designer for lululemon and is alleged to have had a romantic relationship with Potdevin while he was CEO.[14]

Defendant, Glenn Murphy, has served as a member of the Board since April 2017.[15] Previously, he served as the Executive Chairman, Non-Executive

---

[10] Compl. ¶ 12; lululemon athletica inc., Annual Report (Form 10-K) at 18 (Mar. 27, 2019); *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170 (Del. 2006) (noting that the trial court may take judicial notice of facts in SEC filings that are "*not subject to reasonable dispute*") (emphasis in original).

[11] Compl. ¶ 11.

[12] Compl. ¶ 1.

[13] Compl. ¶¶ 13, 47.

[14] Compl. ¶ 53.

[15] Compl. ¶ 14.

Chairman and Co-Chairman of the Board for various intervals between April 2017 and November 2018.[16]

Defendants, Martha A.M. Morfitt, David M. Mussafer, Michael Casey, Emily White, Robert Bensoussan, Kathryn Henry, Jon McNeill and Tricia Patrick are current members of the Board.[17] These Defendants, together with Murphy, comprise nine of the Board's ten members.[18] lululemon's tenth director, Calvin McDonald, has been lululemon's CEO since August 2018, and is not named as a defendant.[19] The additional Defendants are Stuart Haselden, lululemon's COO and former CFO, and Steven J. Collins, a lululemon director until August 2017.[20]

### B. Potdevin's Employment Agreement

Potdevin served as lululemon's CEO under an Executive Employment Agreement (the "Employment Agreement").[21] Per that agreement, the Board was

---

[16] *Id.*

[17] Compl. ¶¶ 15–24.

[18] Compl. ¶¶ 14–16, 18–23, 91.

[19] Compl. ¶ 91.

[20] Compl. ¶¶ 17, 24.

[21] *See* Compl. ¶ 74 (citing lulu220_00001047–48); Transmittal Aff. of Bradley R. Aronstam in Connection with Opening Br. in Supp. of Mot. to Dismiss Pl.'s Verified S'holder Deriv. Am. Compl. ("Aronstam Aff.") (D.I. 26) Ex. 20.

authorized to terminate Potdevin as CEO either "without cause" or "for cause."[22]

If terminated "without cause," Potdevin was entitled to receive significant severance

payments.[23]  If terminated "for cause," Potdevin would receive nothing, except his

accrued base salary through the date of termination.[24]  But, to fire Potdevin for cause,

the Company was obliged to demonstrate that Potdevin had engaged in conduct

constituting "gross negligence, recklessness or willful misconduct with respect to

his obligations under the [Employment] Agreement or otherwise relating to the

business of the Company."[25]

## C. lululemon's Ethics Policies and Board Oversight

According to the Complaint, lululemon developed a Global Code of Business

Conduct and Ethics ("Ethics Code") for its employees.[26]  The Ethics Code made

clear the Company would "not tolerate harassment or unlawful behavior of any kind,

including derogatory comments based on race or ethnicity or unwelcome sexual

advances."[27]  Consistent with these principles, "the Company encouraged employees

---

[22] *Id.*

[23] Compl. ¶¶ 73–74.

[24] Compl. ¶¶ 73–74, 77.

[25] Compl. ¶ 74 (alterations in original) (quotation omitted).

[26] Compl. ¶¶ 31, 37–43.

[27] Compl. ¶¶ 31–33.

to report both violations of the law and violations of lululemon's internal policies."[28] To provide an anonymous means for employees to report potential violations of the Ethics Code, lululemon contracted with a third-party vendor to maintain a "whistleblower hotline."[29] Additionally, the written charters of the Board's Audit, Compensation and Nominating committees established comprehensive guidelines for how each Board committee would oversee the Company's compliance with its policies, including the Ethics Code.[30]

## D. The Toxic Work Culture Under Potdevin

Despite his leadership role at the Company, Potdevin's behavior was inimical to the standards prescribed in the Ethics Code. As alleged, Potdevin "created a toxic culture at lululemon and engaged in a pattern and practice of harassment and sexual favoritism while CEO."[31] He openly expressed "patriarchal beliefs of male superiority," "filled the Company's high-level executive positions with men" and "turned lululemon's executive team into a boy's club."[32] It is alleged Potdevin's

---

[28] Compl. ¶ 35.

[29] *Id.*

[30] Compl. ¶¶ 37–43.

[31] Compl. ¶ 13.

[32] Compl. ¶¶ 49–51.

7

"boys club" would frequently gather either at "his house or hotel rooms for alcoholic beverages and illicit drugs."[33]

In addition to favoring his "boys club," Potdevin allegedly gave preferential treatment to his girlfriend, Linde, a lululemon designer.[34]  This dynamic was not only offensive to more senior and qualified designers, it also empowered other senior male executives to pursue inappropriate personal relationships with junior female employees.[35]

Potdevin's behavior prompted several "talented and high-ranked employees" to leave the Company in protest.[36]  It also led to "a number of employee complaints to the Company's whistleblower hotline."[37]

The Board took notice of Potdevin's relationship with Linde and firmly objected.[38]  Murphy gave "clear direction to Mr. Potdevin that [Linde's] contract should not be renewed beyond the end of 2017."[39]  Potdevin ignored the direction,

---

[33] Compl. ¶ 3.

[34] Compl. ¶¶ 52–55.

[35] Compl. ¶ 56–57.

[36] Compl. ¶ 58.

[37] Compl. ¶¶ 53–55.

[38] Compl. ¶ 55.

[39] *Id.*

however, and Linde remained at the Company (and in her relationship with Potdevin) into 2018.[40]

## E. Incidents 1 and 2

At some point before November 29, 2017, Potdevin was involved in what the Complaint vaguely refers to as "Incident 1."[41]  As best as can be gleaned from the Complaint:

- Incident 1 happened sometime before November 29, 2017;[42]

- It involved Potdevin's "inappropriate conduct" and led the Board to question "his judgment with respect to certain subjects, and the fact that his girlfriend continues to work for the Company;"[43]

- Potdevin informed Mussafer about "Incident 1" at the time it occurred, and Mussafer "subsequently discussed Incident #1 with individual directors as he deemed appropriate in informal un-minuted conversations;"[44] and

- The Board discussed "Incident 1" after the November 29, 2017 Board meeting, off the record, at a dinner following the meeting.[45]

---

[40] *Id.*

[41] Compl. ¶¶ 61–62.

[42] Compl. ¶ 61 (As of November 29, 2017, Incident 1 was described as a "past allegation" against Potdevin.).

[43] *Id.*

[44] Compl. ¶ 62.

[45] Compl. ¶ 63.

Given that they are numbered, it should come as no surprise that "Incident 1" was followed by "Incident 2."[46]  Here again, the Complaint leaves much to the imagination—it alleges only that Incident 2 involved another instance of Potdevin behaving inappropriately.[47]

### F. The Board's Response and Potdevin's Resignation

As noted, the Board discussed Incidents 1 and 2 after the official Board meeting on November 29.[48]  It chose this more informal setting to encourage "an open dialogue on the facts."[49]  Following these informal discussions, the Board decided to launch an investigation into Potdevin's behavior and his fitness to serve as CEO.[50]  The Board met five times thereafter, between November 29, 2017 and February 2018, to discuss how best to deal with Potdevin.[51]

As is typical, the Board hired outside counsel to conduct the investigation.[52] Morfitt and Murphy received at least one oral report from counsel during the course

---

[46] Compl. ¶¶ 61–65.

[47] *Id.*

[48] Compl. ¶ 63.

[49] *Id.*

[50] Compl. ¶ 66.

[51] *See* Oral Arg. on Defs.' Mot. to Dismiss Pl.'s Verified S'holder Deriv. Am. Compl. ("Tr.") (D.I. 46) at 45.

[52] Compl. ¶ 72.

of the investigation and, on January 29, 2018, the Board received and reviewed an 18-page presentation (the "Report") updating the Board on the investigation's interim findings.[53]

While much of the Report was redacted as privileged when produced in response to Plaintiff's 220 demand, the un-redacted information includes headings such as: "Fact Pattern," "What We Believe," "Hypothetical Risk Scenario," "Legal Risk," "Brand Risk," "Media/Reputation Risk," and "Internal Reputation Risk."[54] One page of the Report provides information and guidance intended to "align [the Board] around a course of action and give authority to the Chairman of the Board to execute the Board's direction."[55]

Shortly after reviewing the Report, the Board devised and executed its plan of action. It authorized Murphy to "negotiate the possible terms of a separation agreement and release on behalf of the Company in connection with Mr. Potdevin's potential separation of employment with the Company if Mr. Murphy and Mr. Potdevin agreed that this would be the best path forward."[56]

---

[53] Compl. ¶¶ 67, 72.

[54] Compl. ¶ 61 (citing lulu220_00000101-118); Aronstam Aff. Ex. 19 at lulu220_00000105–97, 116–17.

[55] Aronstam Aff. Ex. 19 at lulu220_00000103.

[56] Compl. ¶ 73.

According to Plaintiff, Incidents 1 and 2 were grounds for the Board to terminate Potdevin for cause.[57] But, instead of firing Potdevin "for cause," the Board offered him a $2.5 million severance payment if he agreed to resign.[58] After some back and forth with Potdevin, the Board ultimately agreed to pay him $5 million in exchange for a full release and quiet departure.[59]

Potdevin and the Company executed a Separation Agreement on February 2, 2018.[60] Under its terms, Potdevin would receive $3.35 million up front with the remainder to be paid out over 18-months.[61] Potdevin also released all claims he might have against the Company and agreed to extend the non-solicitation period beyond the date originally prescribed in his Employment Agreement.[62]

On February 5, 2018, just one week after receiving the Report, the Board announced Potdevin's resignation.[63] The Company issued a press release stating the

---

[57] Compl. ¶ 76.

[58] Compl. ¶ 78.

[59] *Id.*

[60] *Id.*

[61] *Id.*

[62] *Id.*

[63] Compl. ¶ 2.

12

former-CEO "fell short of the Company's standards of conduct."[64] By August, McDonald had taken over as lululemon's CEO.[65]

## G. Procedural Posture

In April 2018, Plaintiff served lululemon with an inspection demand under Section 220 of the Delaware General Corporation Law with the stated purpose of investigating wrongdoing surrounding Potdevin's exit from lululemon.[66] The Company responded by producing some, but not all, of the records Plaintiff had requested.[67]

Armed with the Company's 220 production, on November 21, 2018, Plaintiff elected to file a derivative complaint rather than make a litigation demand upon the Board.[68] After Defendants filed a motion to dismiss, Plaintiff filed the now-operative amended Complaint on April 16, 2019.[69] Defendants moved to dismiss

---

[64] *Id.* (alternations in original).

[65] Compl. ¶ 103.

[66] Compl. ¶ 11.

[67] Compl. ¶ 58.

[68] Compl. ¶ 91.

[69] D.I. 17.

13

that Complaint under Court of Chancery Rule 23.1 on May 16, 2019.[70] The Court heard oral argument on January 22, 2020.[71]

## II. ANALYSIS

The Complaint comprises three derivative counts.[72] Count I alleges the Defendants breached their fiduciary duties by approving Potdevin's Separation Agreement.[73] Count II alleges Potdevin's Separation Agreement constituted corporate waste.[74] Count III is brought against Potdevin, alleging he was unjustly enriched by the Separation Agreement.[75] In light of Plaintiff's decision to forego making a demand, under Court of Chancery Rule 23.1, he must "state with particularity" why he did not ask the Board to pursue these claims.[76]

In his effort to place his claims within the demand futility paradigm, Plaintiff attempts to characterize the Board's decision to enter into the Separation Agreement as either (i) an interested transaction, (ii) not a product of valid business judgment

---

[70] D.I. 19.

[71] D.I. 45.

[72] Compl. ¶¶ 1, 105–126.

[73] Compl. ¶¶ 105–14.

[74] Compl. ¶¶ 115–22.

[75] Compl. ¶¶ 123–26.

[76] Ct. Ch. R. 23.1(b); *Aronson v. Lewis*, 473 A.2d 805, 813–14 (Del. 1984), *overruled in part*, *Brehm v. Eisner*, 746 A.2d 244, 253–54 (Del. 2000).

or (iii) waste.[77] Specifically, the Complaint alleges Defendants "knowingly or recklessly caused, condoned, or allowed the Company to engage in . . . improper practices . . . and *failed to implement adequate internal controls to ensure that lululemon's activities complied with all applicable laws*."[78] At first glance, this allegation, and many others like it in the Complaint, appear to be the makings of a *Caremark* claim.[79] Yet, in his Answering Brief, Plaintiff disavowed any intent to

---

[77] Pl. David Shabbouei's Answering Br. in Opp'n to the Defs.' Mot. to Dismiss Pl.'s Verified S'holder Deriv. Am. Compl. ("PAB") (D.I. 28) at 22, 45, 51.

[78] Compl. ¶ 18 (emphasis supplied); *see also* Compl. ¶¶ 14–24 (same).

[79] *See* Opening Br. in Supp. of Mot. to Dismiss Pl.'s Verified S'holder Deriv. Am. Compl. ("DOB") (D.I. 24) at 42–47 (arguing Plaintiff had failed to state a *Caremark* claim); *see also* Compl. ¶ 4 ("Defendant Potdevin's conduct, and the toxic culture he engendered went unchecked by the lululemon Board."), ¶ 9 ("As a direct and proximate result of the Individual Defendants' conscious, sustained, and systematic failure to exercise appropriate oversight over lululemon."), ¶¶ 14–24 (Murphy, Morfitt, Mussafer, Haselden, Casey, White, Bensoussan, Henry, McNeill, Patrick and Collins "failed to implement adequate internal controls to ensure that lululemon's activities complied with all applicable laws and regulations."), ¶ 29 ("To discharge their duties, each [] Defendant was required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company."), ¶ 30 (The Board was responsible for "ensuring that appropriate risk management policies and procedures [were] in place.") (internal quotation omitted), ¶ 60 (the Board exhibited "near total lack of oversight of lululemon, including willfully ignoring lululemon's toxic culture and defendant Potdevin's improprieties."), ¶ 106 (Defendants had a duty to "conduct good faith investigations into known violations of laws, regulations, and internal policies."), ¶ 108 (Defendants breached their fiduciary duties by "knowingly, recklessly, or with gross negligence: [] failing to ensure that lululemon had adequate internal controls, risk management procedures, and other policies to prevent its executives from engaging in sexual misconduct in the workplace and creating an abusive workplace environment in violation of state laws and regulations.").

15

plead a claim that the Board failed to exercise appropriate oversight.[80] Instead, he maintains he is actually advancing a claim that the Board was "interested" in the Separation Agreement because that agreement, in essence, allowed the Board, acting with undue haste, to sweep its oversight failures under the carpet.[81]

Plaintiff's lack of clarity raises immediate concerns that the Court is faced with "[a] prolix complaint larded with conclusory language" that does not— cannot—meet *Aronson*'s particularized pleading standard.[82] Even so, I follow a deliberate path. First, I address the unique Rule 23.1 pleading standard, as

---

[80] PAB at 2 ("In their Motion to Dismiss, Defendants mischaracterize Plaintiff's claims as *Caremark* claims."); *id*. at 20 n.14 ("Defendants improperly contend that the Amended Complaint must be analyzed by the standards articulated in *Caremark*"); *id.* at 21 ("Plaintiff is not alleging a *Caremark* claim"). *But see* PAB at 46–48 (arguing "the Board was aware that Potdevin engaged in inappropriate behavior with lululemon employees long before it belatedly decided to investigate his misconduct" but failed to fulfil its "duty to investigate" or respond to "red flags."); *Melbourne Mun. Firefighters' Pension Trust Fund on Behalf of Qualcomm, Inc. v. Jacobs*, 2016 WL 4076369, at *8 (Del. Ch. Aug. 1, 2016) (describing a failure to respond to "red flags" as a classic *Caremark* claim). While Plaintiff has sent mixed signals, to put it mildly, I will analyze his claims as he characterized them in his Answering Brief and oral arguments. In Plaintiff's counsel's words, "I understand . . . that there are certainly *Caremark*-sounding allegations in the complaint. I think the primary focus, though, is whether there was a proper process leading to the decision to negotiate a severance and an amicable, as opposed to a firing, situation." Tr. at 39.

[81] *See* Tr. at 60 ("And I think this rushed process is indicative of—is trying to get these guys to leave. And I think the question is motive, right? . . . I think it's to protect themselves too. . . . They worked out a deal with Potdevin."); Tr. at 60–61 (Plaintiff's counsel arguing that the Separation Agreement allowed the Board to avoid exposure of its failures to respond to Incidents 1 and 2).

[82] *Brehm*, 746 A.2d at 254.

deciphered by *Aronson*. I then address whether Plaintiff's claims fit within either of *Aronson*'s two prongs. Finding they do not, I conclude the Complaint must be dismissed for failure adequately to plead demand futility.

## A. The Rule 23.1 Standard

As Justice Moore emphasized in his seminal *Aronson* decision, 8 *Del. C.* § 141(a) codifies a bedrock of Delaware corporate law—the board of directors, not stockholders, manages the business and affairs of the corporation, including the business decision to cause the corporation to sue.[83] When making such business decisions, the Board is entitled to "a presumption" that it "acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[84]

With this in mind, our law has established procedural imperatives to ensure that shareholders do not "imping[e] on the managerial freedom of directors."[85] To wrest control over the litigation asset away from the board of directors, the

---

[83] *Aronson*, 473 A.2d at 811 (citing 8 *Del. C.* § 141(a)).

[84] *Id.* at 812 (citation omitted).

[85] *Id.* at 811.

stockholder must demonstrate that demand on the board to pursue the claim would be futile such that the demand requirement should be excused.[86]

Plaintiff acknowledges he did not make a pre-suit demand on the Board.[87] It is settled, therefore, that his Complaint must "comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings" permitted by Chancery Rule 8.[88] Where, as here, the plaintiff challenges an affirmative board decision, the court analyzes demand futility under the standard established in *Aronson*.[89] This standard safeguards a board's "substantive right" to "rectify an alleged wrong" *unless* a plaintiff can plead particularized facts in support of a reasonable inference that either (i) a majority of the board is interested in the challenged decision, or (ii) the challenged decision was not a product of valid business judgment.[90]

When a court reviews a motion to dismiss under Rule 23.1, plaintiffs are entitled to "all reasonable inferences" that logically flow from "particularized facts"

---

[86] *See Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1044 (Del. 2004).

[87] Compl. ¶ 91.

[88] *Brehm*, 746 A.2d at 254 (noting that conclusory statements or mere notice pleading are insufficient to satisfy Rule 23.1).

[89] *Aronson*, 473 A.2d 805; Tr. at 39.

[90] *Id.* at 809, 812–13; *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008).

18

alleged in the complaint.[91]  Yet the court need not credit "conclusory allegations" or "inferences that are not objectively reasonable" when testing the sufficiency of the plaintiff's pleading.[92]

## B. *Aronson*'s First Prong

From what I gather, Plaintiff maintains demand is excused under *Aronson*'s first prong because the Board was "interested" in entering into the Separation Agreement as a means to hide Board-level failures.[93]  To plead demand futility under this prong, the plaintiff must plead *particularized* facts supporting a reasonable inference that at least 5 of lululemon's 10 directors (i) "appeared on both sides" of the Separation Agreement (ii) derived a "personal financial benefit from it in the

---

[91] *Wood*, 953 A.2d at 140.

[92] *Id.* at 140 (internal quotation omitted).

[93] *See* Compl. ¶ 79 ("Potdevin's departure package was driven by the Board's own fear of being held responsible for allowing the misconduct to continue for so long."); PAB at 45–46; Tr. at 60 (The Board was trying to "protect themselves."); *Aronson*, 473 A.2d at 812 (The presumption of propriety afforded by the business judgment rule can only be "claimed by disinterested directors whose conduct otherwise meets the test of business judgment."); *Ryan v. Armstrong*, 2017 WL 2062902, at *18 (Del. Ch. May 15, 2017), *aff'd*, 176 A.3d 1274 (Del. 2017) (TABLE) (stating that *Aronson*'s first prong is implicated when a plaintiff pleads particularized facts in support of a reasonable inference that a majority of a board approved a transaction based on a "non-corporate motive" and that "the first prong of the *Aronson* inquiry addresses director compliance with the duty of loyalty").  Mindful that I am parroting here, at Plaintiff's insistence, I reiterate that I am not considering his claim as a *Caremark* claim and am not, therefore, undertaking any analysis of demand futility under *Rales*.  *See* Tr. at 39; *Rales v. Blasband*, 634 A.2d 927 (Del. 1993) (applying a different demand futility analysis where the derivative claims do not challenge a business decision of the board but instead challenge the board's failure to act).

sense of self-dealing" or (iii) were beholden to an interested person.[94]  Ultimately, the analysis boils down to whether "a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences."[95]

To well plead that the Board was interested in the Separation Agreement, Plaintiff would need to plead facts supporting an inference that the Separation Agreement extinguished a *substantial likelihood* of Board liability.[96]  Only a substantial likelihood of liability would have a "significant" personal impact on the director, making it "improbable that the director could perform her fiduciary duties to the shareholders without being influenced by her overriding personal interest."[97] With this in mind, I am obliged to do what Plaintiff apparently would prefer I not do—evaluate his failure of oversight allegations.  This is the only way to assess the

---

[94] *Aronson*, 473 A.2d at 812–15; *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 821 (Del. Ch. 2005); *Blaustein v. Lord Balt. Capital Corp.*, 84 A.3d 954, 958 (Del. 2014); *Beneville v. York*, 769 A.2d 80, 85–87 (Del. Ch. 2000) (demand excused where a board is evenly divided between interested and disinterested directors because "a majority vote is required to prevail on a motion to cause the corporation to accept a demand").

[95] *In re J.P. Morgan Chase*, 906 A.2d at 821–22.

[96] *Aronson*, 473 A.2d at 815; *Stritzinger v. Barba*, 2018 WL 4189535, at *5 (Del. Ch. Aug. 31, 2018) (stating that while "substantial likelihood of liability" is not usually thought of as a "pertinent question" under *Aronson*, it is a "crucial factor" underlying the *Aronson* analysis to explore "the potential for personal liability which [could] affect [a board's] capacity to consider demand") (internal quotations omitted).

[97] *Orman v. Cullman*, 794 A.2d 5, 23 (Del. Ch. 2002) (internal quotation omitted).

adequacy of his allegation that the Separation Agreement reflects the Board's affirmative efforts to shroud its underlying wrongdoing and potential liability exposure.[98]

By his own description, Plaintiff does not even attempt to plead an oversight claim, much less allege that the Board faced a substantial likelihood of liability for that claim.[99] And no wonder. Given that the Complaint acknowledges the Company established an ethics code and made the whistleblower hotline available to employees, and then used those systems to detect Potdevin's misbehavior, it is not conceivable that the Board "utterly failed" to establish a relevant information and reporting system.[100] Nor are there allegations in the Complaint that support an inference the Board acted with *scienter*—i.e. with a conscious, *bad faith* state of mind—to ignore Potdevin's improprieties.[101] That the Board could have been more

---

[98] As discussed below, even if the Board's liability exposure should be measured under a lesser standard than "substantial likelihood," the Complaint's allegation still falls short.

[99] *Rattner v. Bidzos*, 2003 WL 22284323, at *9 (Del. Ch. Sept. 30, 2003) ("Except in egregious circumstances, the mere threat of personal liability does not constitute a disabling interest for a director considering a derivative plaintiff's demand.") (internal quotation omitted); *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 149 (Del. Ch. 2003) (finding unpled claims failed to establish a "substantial likelihood" of liability).

[100] *Stone ex rel AmSouth Bancorp. v. Ritter*, 911 A.2d 362, 370 (Del. 2006); Compl. ¶¶ 31, 37, 55.

[101] PAB at 51. *See In re Citigroup Inc. S'holders Litig.*, 964 A.2d 106, 125 (Del. Ch. 2009) (*Caremark* claims require plaintiffs to show directors' decisions "*consciously* disregarded an obligation to be reasonably informed about the business and its risks or *consciously* disregarded the duty to monitor and oversee the business."); *Okla. Firefighters Pension & Ret. Sys.*, 2017 WL 6452240, at *14 (Del. Ch. Dec. 18, 2017) (A claim that directors "failed

effective in its response (and there are no well-pled facts supporting this inference) would not expose its members to liability.[102]

Stripped of conclusory allegations, the Complaint alleges the following to support an inference that the Board faced (unpled) liability when it entered into the Separation Agreement: (i) the Board learned of Incident 1 "prior to" November 2017 and took no action at that time (without pleading *when* Incident 1 occurred or *what* it was);[103] (ii) many Board members had served since lululemon's inception;[104] and (iii) the "#MeToo movement" created "heightened awareness" with respect to allegations of harassment.[105] These allegations do not support an inference of any liability exposure, much less a substantial likelihood of liability.

A vague reference to Incident 1—without any particularized facts concerning *what* Incident 1 involved or *when* it occurred—cannot support a reasonable inference

---

to properly monitor or oversee employee misconduct" requires a showing that "the directors acted with scienter which, in turn, requires . . . proof . . . that the director knew" he was failing to fulfil his oversight obligations.) (internal quotation omitted).

[102] *Stone*, 911 A.2d at 368; *Desimone v. Barrows*, 924 A.2d 908, 935, 936 n.97 (Del. Ch. 2007); *Okla. Firefighters*, 2017 WL 6452240, at *20 ("[A]n ineffective response does not, without more, indicate bad faith.").

[103] Compl. ¶¶ 62–63; PAB at 46, 51.

[104] Compl. ¶¶ 13–24; PAB at 47.

[105] Compl. ¶ 87; PAB at 47.

that the Board consciously disregarded a "duty to act" in between whenever Incident 1 happened and November 2017, when the Board responded.[106] As acknowledged in the Complaint, after Incident 2, the Board promptly: (i) hired external counsel to investigate, (ii) reviewed counsel's Report, (iii) authorized a Board member to negotiate Potdevin's resignation from the Company and (iv) ultimately secured Potdevin's departure without litigation or excessive negative publicity.[107]

Under these circumstances, Plaintiff cannot use an unpled failure of oversight claim as the background to well plead that the Board was somehow interested in the Separation Agreement. "The [B]oard has *responded*" to the threat it perceived in Potdevin's inappropriate behavior, which is inconsistent with a theory of liability exposure predicated on "conscious indifference" to "red flags."[108]

---

[106] *Okla. Firefighters*, 2017 WL 6452240, at *14–15 (Plaintiff must allege the Board failed "to act in the face of a known duty to act" by "consciously disregarding its duty to address [] misconduct."); *Canadian Commercial Workers Indus. Pension Plan v. Alden*, 2006 WL 456786, at *8 (Del. Ch. Feb. 22, 2006) (Plaintiff must plead "specific facts supporting a reasonable inference that Defendants were conscious of the fact that they were not doing their jobs" which requires Plaintiff to plead a "sustained or systematic failure" of the Board's oversight duties.).

[107] Compl. ¶¶ 67, 72–73, 78; *see White v. Panic*, 793 A.2d 356, 371 (Del. Ch. 2000) (reaching the same conclusion under very similar facts).

[108] *White*, 793 A.2d at 371; *South v. Baker*, 62 A.3d 1, 18 (Del. Ch. 2012); *Horman v. Abney*, 2017 WL 242571, at *14 (Del. Ch. Jan. 19, 2017) (stating that a *Caremark* claim is incongruous with allegations that when "red flags were waived," the "Board responded").

There are other reasons to reject Plaintiff's "interestedness" theory. *First*, the argument that a general release obtained on behalf of a board a directors in a settlement is a basis to characterize the settlement as an "interested party transaction" has been squarely rejected by this court.[109] Indeed, except in "egregious" circumstances, "[t]here would be little sense in a rule providing that the presence of such prophylactic measures in a settlement agreement results in that agreement being treated as an interested party transaction."[110]

*Second*, Plaintiff does not even suggest what, if any, claims Potdevin might have had against the Board.[111] And it is not at all clear, from Plaintiff's arguments or otherwise, that the release language in the Separation Agreement would even extend to a breach of fiduciary duty claim against the Board (for failure of oversight or otherwise) brought by Company stockholders.

*Finally*, Plaintiff's efforts to muddy the waters by claiming that Mussafer and Patrick "lack independence due to their direct and indirect pecuniary interest in

---

[109] *H-M Wexford*, 832 A.2d at 149 (observing, "it is more or less universally the case that when a corporation pays value to settle a claim, it demands and receives releases in favor of its directors, officers and other agents."). *See* Aronstam Aff. Ex. 21 at lulu220_00000061 (release language within the Separation Agreement).

[110] *H-M Wexford*, 832 A.2d at 149–50.

[111] Plaintiff concedes this point. *See* PAB at 37 ("There are no allegations in Plaintiff's Amended Complaint nor any facts drawn from any other document that the Court can consider . . . that suggest Potdevin had any valid claims to bring against the Company.").

lululemon through their employment with Advent International" betray the weak sauce of their futility argument.[112]  Plaintiff makes no effort to explain how working for Advent—which allegedly owns 7.4% of lululemon's stock—makes Mussafer and Patrick interested in the Separation Agreement.[113]  To the contrary, this stake in the Company aligns their interests with the Company because "a director who is also a shareholder is *more likely* to have interests that are aligned with the other shareholders of that corporation."[114]

---

[112] PAB at 56.  Plaintiff attempts similar arguments with respect to Defendants, Morfitt, Casey, White and McDonald, but I decline to reach those arguments since it is clear that at least a *majority* of the Board was disinterested and independent.  *In re Ezcorp Inc. Consulting Agmt. Deriv. Litig.*, 2016 WL 301245, at \*34 (Del. Ch. Jan. 25, 2016) ("To determine whether the Board could properly consider a demand, a court counts heads. If the board of directors lacks a majority compromising independent and disinterested directors, then demand is futile.").

[113] The cases Plaintiff cites in his Answering Brief for the proposition that working for a shareholder, *ipso facto* and *ipso jure*, renders a director interested do not stand for that proposition.  Rather, each involved directors who were beholden to an interested party. *See* PAB at 56–57; *Harbor Fin. P'rs v. Huizenga*, 751 A.2d 879, 889 (Del. Ch. 1999) (involving "long-standing . . . business relations" between a director and the controlling stockholder of an acquired company); *Khan v. Tremont Corp.*, 1994 WL 162613, at \*1–2 (Del. Ch. Apr. 21, 1994) (involving directors who were personally beholden to a controlling stockholder to whom the corporation sold a 15% block of stock); *In re Ezcorp*, 2016 WL 301245, at \*36 (involving a director who was being asked to sue an individual who had "the ability to influence" the director's "future" with his employer); *In re The Student Loan Corp. Deriv. Litig.*, 2002 WL 75479, at \*3 (Del. Ch. Jan. 8, 2002) (involving directors who owed their "livelihood" to Citigroup—a controlling stockholder with which they caused a company to engage in self-dealing transactions).

[114] *Chen v. Howard-Anderson*, 87 A.3d 648, 671 (Del. Ch. 2014) (alternation in original, emphasis supplied and internal quotation omitted); *see also Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 55–56, 65 (Del. 1989) (director's status as president of a major shareholder "d[oes] not make him an interested director").

## C. *Aronson*'s Second Prong

To satisfy *Aronson*'s second prong, Plaintiff must plead particularized facts in support of a reasonable inference that the Board's decision to enter the Separation Agreement was not a product of valid business judgment.[115]  In other words, the Board's action must have been "inexplicable with reference to business judgment."[116]  Because *Aronson*'s second prong implicates a frontal attack on a board's business decisions, our Supreme Court has emphasized that a plaintiff carries a "heavy burden" when attempting to excuse demand by taking this path.[117]  And while this prong "analyzes both care and loyalty issues," when the board operates under an exculpatory charter provision, like lululemon's,[118] demand is only excused by well pleading that a majority of the Board acted in breach of the duty of loyalty, that is, the challenged decision must be "so egregious on its face that board approval cannot meet the test of business judgment."[119]

---

[115] *Aronson*, 473 A.2d at 814.

[116] *Ryan*, 2017 WL 2062902, at *14.

[117] *White v. Panic*, 783 A.2d 543, 551 (Del. 2001) (internal quotation omitted); *White*, 793 A.2d at 367 (*Aronson*'s second prong involves an attack on "the soundness of the challenged transaction.") (citation omitted).

[118] Aronstam Aff. Ex. 31 Art. 9.1; *In re Tangoe, Inc. S'holders Litig.*, 2018 WL 6074435, at *12 n.79 (Del. Ch. Nov. 20, 2018) ("A court may take judicial notice of an exculpatory charter provision in resolving a motion addressed to the pleadings.") (citation omitted).

[119] *Aronson*, 473 A.2d at 815; *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 64–66 (Del. 2006).  Plaintiff's argument that he can excuse demand by pleading a violation of the Board's duty of care notwithstanding the Company's 102(b)(7) Charter provision has been

Even if Plaintiff could plead demand futility by pleading a breach of the Board's duty of care (he cannot), his Complaint would still fall short.[120] The business judgment rule prevents Delaware courts from evaluating whether decision-makers made a "right" or "wrong" decision.[121] Rather, our courts properly focus on the "process" employed to make a decision.[122] To state a claim that a board breached its duty of care, the plaintiff must plead facts "predicated upon concepts of gross negligence."[123] And such facts must be considered against the presumption that the board's decisions were made in the company's best interest.[124] This fundamental precept calls for deference to the board's decisions regarding (i) how

---

squarely rejected by this court. *See Ellis v. Gonzalez*, 2018 WL 3360816, at *6 (Del. Ch. July 10, 2018) (noting that "AbbVie's certificate of incorporation contains a Section 102(b)(7) clause that exculpates the directors from liability for duty-of-care violations," and holding, therefore, that the derivative plaintiff had to "adequately allege that a majority of AbbVie's board faces a substantial likelihood of liability for breaching the duty of loyalty.") (citing cases); *Leonis v. Lawal*, 2017 WL 5289611, at *11, *14–15 (Del. Ch. Nov. 7, 2017) (same); *Ryan*, 2017 WL 2062902, at *17 (citing *Aronson*, 473 A.2d at 815) (same).

[120] *See* PAB at 43.

[121] *In re Citigroup*, 964 A.2d at 124.

[122] *Id.* at 124 ("[T]he fiduciary duty of care and the business judgment rule . . . focus on the decision-making process rather than on a substantive evaluation of the merits of the decision.").

[123] *Aronson*, 473 A.2d at 812.

[124] *Id.* at 812.

much information it needed before it decided to act and (ii) how to structure its meetings.[125]

Plaintiff draws two lines of attack with respect to the Board's decision-making process. *First*, he argues the Board made a "conscious decision to allow Potdevin to decide his own fate."[126] *Second*, he claims the Board rushed to negotiate and sign the Separation Agreement after conducting cursory informal meetings (without minutes).[127] None of the alleged shortcomings Plaintiff identifies support an inference of gross negligence—much less *bad faith* or conflicts of interest.

As for Plaintiff's first advance, the theory is that, even though it knew Potdevin's presence at the Company was destructive, the Board simply allowed Potdevin to decide for himself whether he would continue as lululemon's CEO.[128]

---

[125] *Citron v. Fairchild Camera and Instrument Corp.*, 1988 WL 53322, at *17 (Del. Ch. May 19, 1988) ("Thus, just how much information prudence requires before a decision is made is itself a question that calls for informed judgment of the kind courts are not well-equipped to make. . . . In my opinion, where a disinterested board in good faith considers the significance of the decision called for, the available information of which it and its advisors are aware and the time constraints imposed upon it, and in those circumstances, the board makes a decision that it *is* in the best interests of the corporation to act, that decision itself is entitled to the benefits of the business judgment rule."); *In re RJR Nabisco, Inc. S'holders Litig.*, 1989 WL 7036, at *19 (Del. Ch. Jan. 31, 1989) ("The amount of information that it is prudent to have before a decision is made is itself a business judgment.").

[126] Compl. ¶ 72; PAB at 27.

[127] Compl. ¶¶ 6–7, 66, 68, 72; PAB at 10, 22–25, 31–33.

[128] Compl. ¶ 7; PAB at 33–34.

The only fact Plaintiff can muster in support of this conclusion comes from the Board's minutes authorizing Murphy to negotiate with Potdevin.[129] Specifically, minutes from the end of January, created shortly before Potdevin resigned, recount that:

> The independent directors . . . met telephonically on January 31, 2018. . . Mr. Murphy stated that the **purpose of the meeting was to continue the discussion from the previous meetings of the independent directors regarding allegations of inappropriate behavior by Mr. Potdevin** and his future employment with the company. The directors considered the legal and brand risk to the Company regarding various outcomes and the legal advice provided by the Company's external counsel. The directors discussed and considered what course of action would be in the best interest of the Company, its employees and its shareholders. Following the discussion, the directors agreed that Mr. Murphy would . . . **meet with Mr. Potdevin to discuss the best path forward for the Company.**
>
> The independent directors discussed the terms of Mr. Potdevin's employment agreement and **authorized Mr. Murphy to negotiate the possible terms of a separation agreement** and release on behalf of the Company **in connection with Mr. Potdevin's potential separation of employment with the Company if Mr. Murphy and Mr. Potdevin agreed that this would be the best path forward. The directors authorized Mr. Murphy to negotiate a separation agreement and release within parameters set forth by the Board in that event.**[130]

---

[129] PAB at 33–34 (citing Aronstam Aff. Ex. 18 at 1).

[130] Aronstam Aff. Ex. 18 at 1 (emphasis supplied). Here, I note Plaintiff's assertion that the Board "authorized the Chairman of the Board to unilaterally negotiate the terms of Potdevin's severance agreement with him, without any input from the Board or Compensation Committee," is flatly contradicted by these minutes, which state clearly that the Board authorized Murphy to "negotiate . . . within parameters set forth by the Board." PAB at 4.

These minutes do not reasonably support the inference Plaintiff asks the Court to draw. Plaintiff underscores that the Board only authorized a "*potential* separation . . . if Mr. Murphy and Mr. Potdevin agreed."[131] But nothing about this Board direction supports a reasonable inference that the Board deferred to Potdevin's judgment. Rather, it shows the Board authorized Mr. Murphy to *negotiate* Potdevin's resignation—if he would agree to a peaceful separation. If Potdevin would not go quietly, Murphy was to return to the Board for further direction. Nothing about this approach placed Potdevin in control of his fate.

Relatedly, Plaintiff proclaims that the Board had a duty to make a "decision" to fire Potdevin *before* Murphy attempted to negotiate his resignation.[132] I see no basis to impose that duty, and Plaintiff offers none. The far more reasonable decision-making process would be—as the Board did here—to determine whether Potdevin would leave peacefully on mutually acceptable terms before deciding to go to war with him.[133]

Turning to Plaintiff's second line of attack, he faces the fruitless task of maintaining credibility while arguing that the Board was too slow to respond to

---

[131] PAB at 34 (emphasis supplied).

[132] Tr. at 61.

[133] *See Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 57–58 (Del. Ch. 2015) (Under Rule 23.1, a court need not draw "hyper-technical and unreasonable" inferences that are based on "unsupported leap[s] of logic.").

Incident 1, but too fast in its response to Incident 2.[134] For example, Plaintiff faults the Board for not waiting for the external investigation to be "completed" or for the Board's sub-committees to make separate, formal presentations before taking action.[135] Yet Plaintiff affirmatively pleads that Potdevin created a "toxic . . . culture of oppression."[136] When pressed, Plaintiff's counsel conceded that the Board had no real option other than to act when it did either to negotiate Potdevin's resignation or fire him for cause.[137] It is the Board's prerogative to decide when it had enough information to decide how to separate Potdevin from the Company—not Plaintiff's.[138]

---

[134] *Compare* Compl. ¶ 92 ("Defendants . . . fail[ed] to take any meaningful action to remedy defendant Potdevin's misconduct and the toxic environment festering under his leadership despite knowledge thereof."), *with* PAB at 28 ("[T]here is no allegation in the [Complaint] or indication in the Board minutes that the external investigation was even completed when the Board made its decision."), *and* Tr. 59 ("I think what this shows is a board that chose to rush a process where there was no need to act now.").

[135] PAB at 27–29. Additionally, Plaintiff faults the Board for not making an "affirmative" decision to "investigate" Potdevin's inappropriate behavior beyond reviewing the Report. PAB at 2. I struggle to follow the logic of that argument. The Report provided the Board with information relating to the investigation it had already commissioned. And the Board was justified in relying upon it as it determined how best to proceed. 8 *Del. C.* § 141(e).

[136] Compl. ¶ 3.

[137] Tr. at 55.

[138] *Citron*, 1988 WL 53322, at *17; *In re RJR Nabisco*, 1989 WL 7036, at *19.

31

There is no "single blueprint" a Board must follow to satisfy its fiduciary duties.[139] On January 29, the Board reviewed the Report.[140] Two days later, the Board authorized Murphy to negotiate Potdevin's resignation and, on February 5, Potdevin was gone.[141] Even if this were all that the Board did before settling with Potdevin (it is not),[142] Plaintiff would fall well short of pleading "particularized facts [] such that it is *difficult to conceive* that a director *could have satisfied* his or her fiduciary duties."[143]

This conclusion is even more inevitable in light of the purely discretionary nature of the challenged Board decision—whether or not to settle with the CEO. In this regard, a board's decision regarding executive compensation provides a useful analogy. "The size and structure of executive compensation are *inherently*

---

[139] *Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1286 (Del. 1989).

[140] Compl. ¶ 61.

[141] Compl. ¶¶ 61, 76.

[142] Plaintiff acknowledges, in-between Incident 2 in late-2017 and February 5, 2018, the Board: "(i) launched an internal investigation," (ii) "hired a firm to conduct an external investigation," (iii) "formed a subcommittee related to the decision" and (iv) "considered the ramifications to the Company's brand image." PAB at 24; Tr. 45 (Plaintiff's counsel concedes the Board met five times to discuss Potdevin's improprieties.). *See also* Compl. ¶ 61 (discussing the Report the Board reviewed on January 29), ¶ 63 (discussing the Board's decision to review Incidents 1 and 2 in informal conversations to encourage "an open dialogue on the facts"), ¶ 72 ("lululemon initiated two investigations into defendant Potdevin's inappropriate conduct.").

[143] *Ryan*, 2017 WL 2062902, at *17 (emphasis supplied and internal quotation omitted).

matters of judgment."[144] Just as in the case of setting executive compensation, the Board was operating well-within the bounds of proper business judgment when it decided to settle with Potdevin rather than fire him "for cause," a decision that could have embroiled the Company in an embarrassing legal battle with its former CEO.

While it is not entirely clear where these allegations fit within his theory of demand futility, Plaintiff makes much of the Board's decision to discuss Potdevin's future with the Company during informal, un-minuted meetings.[145] I say the relevance is unclear because Plaintiff asks the Court to draw contradictory inferences that (i) the Board did not discuss "Potdevin's improprieties in any meaningful sense" versus (ii) the Board "discuss[ed] the allegations against Potdevin" in informal meetings "to . . . prevent scrutiny of Potdevin's improprieties [and] . . . its actions in response to the wrongdoing."[146] I need not attempt a reconciliation of discordant inferences because I am satisfied that nothing about the Board's decision to meet informally to discuss Potdevin, as alleged here, supports a reasonable inference of wrongdoing.

---

[144] *Brehm*, 746 A.2d at 263 (citation omitted and emphasis supplied). *See also White*, 793 A.2d at 369 ("[T]his [c]ourt's deference to directors' business judgment is particularly broad in matters of executive compensation.") (quotation omitted).

[145] *See* PAB at 10, 24, 31–33.

[146] PAB at 10, 24, 32–33.

As noted, the Complaint acknowledges the Board *did* discuss Potdevin's improprieties and what best to do about them.[147] And, while this court has been suspicious of a board's choice to conduct un-minuted meetings in other circumstances, those instances involved other compelling facts weighing in favor of demand futility, which are lacking here.[148] Under the circumstances as alleged, the Board's decision to use "off the record conversations" to encourage "an open dialogue on the facts" concerning what should be done about the Company's CEO is entitled to deference.[149]

**D. Waste**

In a last-ditch effort to plead demand futility, Plaintiff argues the Board's decision to sign the Separation Agreement, rather than fire Potdevin for cause, was

---

[147] *See, e.g.*, Compl. ¶¶ 61, 67 (discussing the Report which contained facts surrounding Incidents 1 and 2).

[148] *See, e.g.*, *Texlon Corp. v. Bogomolny*, 792 A.2d 964, 974–75 (Del. Ch. 2001) (holding that a plaintiff had stated a claim for breach of fiduciary duty, a conclusion that was "influenced" by the allegation that "there were no minutes kept of the meetings of the [company] board meetings" in addition to the pled-facts that "none of the defendants . . . was able to act independently of [the board's chairman] and that the terms of the [challenged transaction with the chairman] . . . were unfair to the company"); *Feuer on behalf of CBS Corp. v. Redstone*, 2018 WL 1870074, at *13–14 n.146 (Del. Ch. Apr. 19, 2018) (considering a lack of minutes discussing Redstone's $1.75 million annual salary as Executive Chairman of the board in the context of, *inter alia*, his (i) failure to attend board meetings, (ii) substantial health impairment, (iii) incomprehensible speech and (iv) "non-responsive" interactions with the people around him).

[149] Compl. ¶ 63.

"completely unnecessary and wasteful."[150] By Plaintiff's lights, "Potdevin would not have been in any position to mount a legal challenge to a 'for cause' dismissal."[151] Thus, the decision to pay him $5 million under the Severance Agreement constituted "unwarranted severance."[152]

To state a claim for waste, Plaintiff must plead that the Separation Agreement "cannot be attributed to any rational business purpose."[153] In other words, Plaintiff must plead facts that allow a reasonable inference the Separation Agreement amounted to "a transfer of corporate assets that serve[d] no corporate purpose[,] or for which no consideration at all [was] received."[154] No such inference may be drawn here.

*First*, as Plaintiff's waste claim, itself, demonstrates, there is nothing that would have prevented Potdevin from challenging (in a very public way) a

---

[150] PAB at 1–2, 35.

[151] PAB at 35.

[152] *Id.*

[153] *In re Volcano Corp. S'holder Litig.*, 143 A.3d 727, 750 (Del. Ch. 2016) (quoting *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993)).

[154] *Protas v. Cavanagh*, 2012 WL 1580969, at *9 (Del. Ch. May 4, 2012) (alteration in original and internal quotation omitted).

"for cause" dismissal, even if he lacked a good argument.[155]  *Second*, Plaintiff's

theory that the Company got no value from the Separation Agreement ignores that

the Board (i) required Potdevin to release all the claims he had against the Company

and (ii) secured an extended non-solicitation covenant from Potdevin.[156]  But even

ignoring these corporate benefits, it is undisputed that the Separation Agreement

liberated the Company from Potdevin's troublesome tenure as CEO, facilitated the

Company's efforts swiftly to remediate an environment the Complaint describes as

"toxic" and allowed the Company to avoid potentially costly and embarrassing

litigation.[157]  These, by any measure, are corporate benefits.

While there is an "outer limit," at which point "a decision of the directors . . .

is so disproportionately [irrational] as to be unconscionable and constitute waste,"

Plaintiff has not come close to reaching that limit.[158]  "There is nothing wrong with

your television set,"[159] demand is not futile with respect to Plaintiff's waste claim.

---

[155] *See Brehm*, 746 A.2d at 265 ("All this shows is that the Board had *arguable* grounds to fire Ovitz for cause.  But what is alleged is only an *argument*—perhaps a good one—that Ovitz' conduct constituted gross negligence or malfeasance.").

[156] Compl. ¶ 78; PAB at 37–38.

[157] Compl. ¶ 78; PAB at 37–38.

[158] *In re Citigroup*, 964 A.2d at 138.

[159] *The Outer Limits* (American Broadcasting Company 1963–65).

### E. Unjust Enrichment

As Plaintiff has failed to plead particularized facts to support an inference that the Board cannot manage the Company's litigation asset, including its potential claim against Potdevin for unjust enrichment, this claim also must fail under Rule 23.1. For reasons discussed above, the Board is not "interested" with respect to the Separation Agreement or any claim that Potdevin was unjustly enriched by it, and the Complaint pleads no facts to allow a reasonable inference that a majority of the Board is beholden to Potdevin.

## III. CONCLUSION

For the foregoing reasons, Defendants' Motion must be GRANTED. The Complaint is dismissed with prejudice.

**IT IS SO ORDERED.**