# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LAURIE A. HANNA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2024-0228-KSJM |
| | ) | |
| ANDREW PARADISE, et al., | ) | |
| | ) | |
| Defendants, and | ) | |
| | ) | |
| SKILLZ INC., | ) | |
| | ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: January 7, 2025
Date Decided: July 3, 2025

Christine M. Mackintosh, Vivek Upadhya, William G. Passannante II, Demetrius M. Davis, GRANT & EISENHOFER P.A., Wilmington, Delaware; Robert E. Bishop, Frank Partnoy, BISHOP PARTNOY LLP, Washington, D.C.; Peretz Bronstein, Eitan Kimelman, BRONSTEIN, GEWIRTZ & GROSSMAN, LLC, New York, New York; *Counsel for Plaintiff Laurie A. Hanna.*

Thomas W. Briggs, Jr., Ryan D. Stottmann, Matthew R. Clark, Taylor A. Christensen, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Lazar P. Raynal, Michael A. Lombardo, KING & SPALDING LLP, Chicago, Illinois; B. Warren Pope, KING & SPALDING LLP, Atlanta, Georgia; *Counsel for Defendants and Nominal Defendant Skillz Inc.*

**McCORMICK, C.**

The stockholder plaintiff asserts derivative claims for insider trading against fiduciaries who sold shares in the nominal defendant's secondary public offering. The plaintiff alleges that the defendants knew, when they sold in the public offering, that the company was expecting significantly larger adjusted EBITDA losses than analysts had forecasted. And by timing the offering to occur before the company announced its adjusted EBITDA losses and the stock price fell, the defendants made $93 million more than they would have if they had sold later. The defendants have moved to dismiss the complaint under Court of Chancery Rules 23.1 and 12(b)(6). They argue that the plaintiff failed to plead a reason to doubt the impartiality of the company's board for Rule 23.1 purposes. They further argue that the plaintiff has failed to allege the necessary elements of an insider trading claim under Rule 12(b)(6).

This decision punts on both motions. The Rule 23.1 motion hinges on the materiality of a business relationship between one director's consulting company and the nominal defendant. If the business relationship is material to the director, then it is reasonable to infer that the director lacks independence from the person who can terminate that relationship—the controller and CEO, who materially benefited from the challenged sales. The director disclosed the business relationship on his director and officer questionnaire, and his consulting company lists the nominal defendant as a client on its website. Despite this, the defendants argue that it is unreasonable to infer that the business relationship was material. To make that argument, they rely on representations that defense counsel made to the plaintiff's counsel in correspondence before the plaintiff filed this suit.

Given the defendants' reliance on facts outside of the pleadings, this decision converts the Rule 23.1 motion into a motion for summary judgment to allow discovery into the discrete issues concerning the director's independence. Because success on the Rule 23.1 motion could obviate the Rule 12(b)(6) motion, this decision stays consideration of the Rule 12(b)(6) motion.

## I. FACTUAL BACKGROUND

The facts are drawn from the Verified Stockholder Derivative Complaint (the "Complaint") and the documents it incorporates by reference.[1]

### A. The Insider Trading Policy

Skillz Inc. ("Skillz" or the "Company") is a Las Vegas-based company that provides mobile games and a video game competition, or "e-sports," platform. CEO Andrew Paradise and Chief Strategy Officer Casey Chafkin founded Skillz in 2012. Skillz went public in 2020 through a de-SPAC merger that valued the Company at approximately $3.5 billion.

Skillz's directors and officers are subject to an Insider Trading Policy (the "Policy"), which governs the "trading of securities while [a party is] in possession of [material non-public information] . . . about the Company[.]"[2] The Policy defines "material information" as:

> any information that a reasonable investor would consider important in arriving at a decision to buy, sell or hold the securities of a company and/or would view its disclosure as

---

[1] C.A. 2024-0228-KSJM, Docket ("Dkt.") 1 ("Compl.").

[2] Compl., Ex. 6 (Policy) § I.

significantly altering the total mix of information otherwise made available.[3]

The Policy defines "non-public information" as "information that is not generally known to the public" and identifies examples, including "financial information, such as revenues, expenses, earnings, new sales or investment returns[,]" and "earnings estimates."[4]

The Policy also prohibits Skillz directors, officers, and their controlled entities, from "trad[ing] Company securities during scheduled 'blackout' periods commencing on the fifteenth day of the month in which a fiscal quarter ends and ending at the close of regular trading on the second full Trading Day after the release of quarterly or annual earnings."[5]  The Policy expressly excludes: *bona fide* gifts, option exercises, restricted stock awards, transactions in mutual funds, any other sale of Skillz securities to or from the Company, and transactions made under Rule 10b5-1 trading plans.

### B. Skillz's Board Sets The Public Offering In Motion After Receiving Allegedly Material Non-Public Information.

On March 3, 2021, the Skillz Audit Committee—comprising directors Kent Wakeford and Vanna Krantz—met by video conference.  During the meeting, management reviewed Q4 2020 financial results, full fiscal year 2020 results, draft earnings materials, and a draft of the Company's March 12 Form 10-K.

---

[3] *Id*. § IX.

[4] *Id*.

[5] *Id*. § X.

On March 4, 2021, Skillz's Board of Directors held a meeting to discuss the Company's financial performance. At the time, the Board comprised Defendants Paradise, Chafkin, Wakeford (collectively, the "Director Defendants"), and non-parties Krantz, Harry Sloan, and Jerry Bruckheimer. The Company's Vice President of Legal, Charlotte Edelman, and then-Chief Technology Officer Miriam Aguirre (together with Chafkin and Wakeford, the "Officer Defendants"), also attended the meeting.

The Board received both positive and negative information. The positive report concerned the Company's 2020 financials. Like the Audit Committee had a day earlier, the Board learned that the Company's revenue had grown to $68 million during Q4 2020, up 95% as compared with $35 million in Q4 2019. It is also reasonable to infer that the Board received negative information: the Company would issue guidance for Q1 2021 that would miss analysts' expectations.

At the same meeting, the Board and management reviewed plans for a second public offering (the "Public Offering"), which the Company hoped would raise $1 billion of primary capital, expand Skillz's stockholder base with "fundamental investors," and "reduce overhang."[6] The plan contemplated that Skillz would release its Q4 2020 earnings on March 10, file its 10-K on March 11, launch the offering on March 16, finalize pricing on March 17, and close on March 22. The meeting minutes do not reflect when the Company would announce guidance for Q1 2021.

---

[6] Compl., Ex. 4 at -377.

Under this timeline, the Public Offering would occur during a blackout window under the Policy that would begin on March 15 and run until the second full trading day after the release of Skillz's Q1 2021 earnings.

## C. Skillz Announces Full Year 2020 Results And Issues Full Year 2021 Guidance.

On March 10, 2021, Skillz filed its March 10 Form 8-K. The 8-K disclosed Skillz's revenue growth of "$68 million during the fourth quarter of 2020, 8% higher than expectations, and up 95% compared with $35 million during the comparable quarter in 2019."[7] A press release issued with the 8-K included a quote from Paradise stating that the Company was "look[ing] forward to many more such quarters ahead."[8] The same day, Skillz held an earnings call during which Paradise stated that Q4 2020 marked the Company's "20th consecutive quarter of sequential revenue growth."[9]

On March 12, Skillz filed its Form 10-K, which included the Company's positive full-year 2020 results, including a "92% growth in revenue from 2019 to 2020, from about $120 million in calendar year 2019 to about $230 million in calendar year 2020."[10] None of the information released on March 10 or 12 reflected the below-consensus revenue scenarios the Board considered on March 4.

---

[7] Compl. ¶ 68.

[8] *Id.*

[9] *Id.*

[10] *Id.* ¶ 69.

## D. The Public Offering

On March 15, 2021, Skillz announced its plans to conduct the Public Offering and filed a draft Registration Statement. On March 18, Paradise, Chafkin, Sloan, Edelman, and CFO Scott Henry met to discuss the Public Offering. Paradise, Chafkin, and Sloan comprised the "Pricing Committee," which "engaged in discussions with the Underwriters to determine the price at which the [Public] Offering [s]hares shall be sold to the public, and the underwriting discounts and commissions applicable to the sale of the Offering [s]hares."[11] The Pricing Committee set the per share Public Offering price at $24, which the Company announced later that day.

Skillz completed the Public Offering on March 23, selling 36,800,000 shares of Skillz's Class A common stock, 19.8 million of which were sold by Skillz stockholders. After an underwriting discount, each stockholder selling stock in the Public Offering netted $23.34 per share.

Sales by Defendants comprised over half of the Public Offering. In addition to these direct sales, Paradise, Edelman, and Henry directed the sale of shares for trusts connected with Paradise and Wakeford (the "Trust Defendants").[12]

- Paradise sold $196,122,892.40 worth of Skillz stock, and The Andrew Paradise Dynasty and Jeremy Paradise Dynasty Trusts sold $6,295,871.64 worth of Skillz stock, collectively,

- Chafkin sold $39,061,800.66 worth of Skillz stock,

---

[11] *Id.* ¶ 73.

[12] The Trust Defendants are the Andrew Paradise Dynasty Trust, the Jeremy Paradise Dynasty Trust, and the Wakeford 2018 Irrevocable Trust.

- Aguirre sold $6,414,415.50 worth of Skillz stock,

- Wakeford sold $991,133.10 worth of Skillz stock, and the Wakeford 2018 Irrevocable Trust sold $792,906.48 worth of Skillz stock, and

- Edelman sold $708,135.60 worth of Skillz stock.

Other stockholders (the "Stockholder Defendants," and with the Officer Defendants, Director Defendants, and Trust Defendants, "Defendants") sold $211,744,844.58 worth of Skillz stock.

### E.    Skillz Announces Q1 2021 Guidance.

On March 25, 2021, fifteen days after the positive revenue release, five days after the announcement of the Public Offering, and two days after the offering closed, Skillz filed a Form 8-K that disclosed its outlook for Q1 2021. The Company anticipated that its revenue, number of monthly active users, and number of paying monthly active users would exceed analyst estimates for the quarter. But the outlook also reflected that Skillz expected larger adjusted EBITDA losses than analysts had predicted: Skillz predicted negative $37 million in adjusted EBITDA as compared to street expectations of negative $21.8 million to $24.5 million.

Skillz's stock price fell after the announcement. By the close of trading on March 25, Skillz's stock price had fallen to $19.34, a 3.25% decline. By the close of trading on March 26, the stock price was at $18.60, a further 3.8% decline and a total two-day decline in excess of 7%. By the time the next trading window opened on May 6, Skillz's stock price had dropped to $15.41.

By selling their shares in the Public Offering, as opposed to after Skillz released its 2021 Q1 guidance, Defendants made more in sales than if they had sold later:

- Paradise made $39,829,584.84 more, and The Andrew Paradise Dynasty and Jeremy Paradise Dynasty Trusts made $1,278,596.04 more;

- Chafkin made $7,932,859.26 more;

- Aguirre made $1,302,670.50 more;

- Wakeford made $201,284.10 more, and The Wakeford 2018 Irrevocable Trust made $161,027.28 more; and

- Edelman made $143,811.60 more.[13]

## F. The Derivative Litigation

Plaintiff Laurie A. Hanna filed this derivative lawsuit asserting the following claims:

- Counts I through III against Paradise as controller, the Director Defendants, and the Officer Defendants, respectively, for breaches of fiduciary duty in connection with the Public Offering, alleging under *Brophy v. Cities Service Co.*[14] that the Count I through III Defendants traded Skillz's stock while in possession of material non-public information;

- Counts IV and V against the Trust Defendants and Stockholder Defendants, respectively, for aiding and abetting the breaches of fiduciary duty alleged in Counts I through III; and

- Count VI against all Defendants for unjust enrichment as a result of the Public Offering.

---

[13] Plaintiff calculated these figures "as the difference between the price on the day after [Skillz issued 2021 Q1 guidance], March 26 ($18.60), and the price the individual sold at in the offering, $23.34, multiplied by the number of shares sold." Compl. ¶ 33 n.38.

[14] 70 A.2d 5 (Del. Ch. 1949).

On April 23, 2024, Plaintiff voluntarily dismissed two of the Stockholder Defendants—one deceased, and the other in Chapter 11 bankruptcy.[15] Plaintiff later voluntarily dismissed 55 other Stockholder Defendants, each of whom had moved to dismiss for lack of personal jurisdiction.[16]

Defendants moved to dismiss the action on June 12, 2024.[17] The parties completed briefing on August 21, 2024, and the court heard oral argument on January 7, 2025.[18]

## II.     LEGAL ANALYSIS

Defendants have moved to dismiss the Complaint under Court of Chancery Rule 23.1 for failure to plead demand futility and Rule 12(b)(6) for failure to state a claim. Because this decision converts a discrete aspect of the Rule 23.1 motion into a motion for summary judgment, the outcome of which could obviate Defendants' Rule 12(b)(6) arguments, this decision does not reach those arguments here.

"A cardinal precept of [Delaware law] is that directors, rather than shareholders, manage the business and affairs of the corporation."[19] "In a derivative

---

[15] Dkt. 27; *see also* Dkt. 56 ("Pl.'s Answering Br.") at 1 n.3.

[16] Dkt. 57; *see also* Pl.'s Answering Br. at 1 n.3.

[17] Dkt. 44.

[18] Dkt. 65.

[19] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) (citing 8 *Del. C.* § 141(a)), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). In *Brehm*, 746 A.2d at 253–54, the Delaware Supreme Court overruled seven precedents, including *Aronson*, to the extent those precedents reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of discretion standard or otherwise suggested a deferential appellate review. *See id.* at 253 & n.13 (overruling in part on this issue *Scattered Corp. v. Chi. Stock Exch., Inc.*, 701 A.2d 70, 72–73 (Del. 1997); *Grimes v. Donald*, 673 A.2d 1207, 1217 n.15 (Del. 1996); *Heineman v. Datapoint Corp.*, 611 A.2d 950, 952

9

suit, a stockholder seeks to displace the board's authority over a litigation asset and assert the corporation's claim."[20]   Because derivative litigation encroaches on the managerial freedom of directors, "a stockholder only can pursue a cause of action belonging to the corporation if (i) the stockholder demanded that the directors pursue the corporate claim and they wrongfully refused to do so or (ii) demand is excused because the directors are incapable of making an impartial decision regarding the litigation."[21]   The demand requirement is a substantive principle under Delaware law.[22]

Rule 23.1 is the "procedural embodiment" of the demand requirement.[23]   Under Rule 23.1, a derivative complaint must "state with particularity: . . . any effort by the derivative plaintiff to obtain the desired action from the entity; and . . . the reasons for not obtaining the action or not making the effort[.]"[24]

---

(Del. 1992); *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991); *Grobow v. Perot*, 539 A.2d 180, 186 (Del. 1988); *Pogostin v. Rice*, 480 A.2d 619, 624–25 (Del. 1984); and *Aronson*, 473 A.2d at 814).  The *Brehm* Court held that going forward, appellate review of a Rule 23.1 determination would be *de novo* and plenary.  746 A.2d at 253–54.  The seven partially overruled precedents otherwise remain good law.  This decision does not rely on any of them for the standard of appellate review.  Although the technical rules of legal citation would require noting that each was reversed on other grounds by *Brehm*, this decision omits the subsequent history, which creates the misimpression that *Brehm* rejected core elements of the Rule 23.1 canon.

[20] *United Food & Com. Workers Union & Participating Food Indus. Empls. Tri-State Pension Fund v. Zuckerberg*, 250 A.3d 862, 876 (Del. Ch. 2020) [*Zuckerberg I*], aff'd, 262 A.3d 1034 (2021) [*Zuckerberg II*].

[21] *Id.*

[22] *Id.*

[23] *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993).

[24] Ct. Ch. R. 23.1(a)(1) (as amended Sept. 25, 2023).

10

A stockholder can satisfy the demand requirement by pleading that demand is futile. To plead demand futility, the complaint must allege "particularized factual statements that are essential to the claim."[25] Although the requirement of factual particularity is a heightened pleading requirement, it "does not entitle a court to discredit or weigh the persuasiveness of well-pled allegations."[26] If a plaintiff pleads particularized facts, those factual allegations "are accepted as true" and "[p]laintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged[.]"[27]

In *Zuckerberg*, the Delaware Supreme Court adopted a "universal test" for demand futility that blends elements of the two precursor tests: *Aronson* and *Rales*.[28] When conducting a demand futility analysis under *Zuckerberg*, Delaware courts ask, on a director-by-director basis:

> (i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;
>
> (ii) whether the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and
>
> (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of

---

[25] *Brehm*, 746 A.2d at 254.

[26] *Zuckerberg I*, 250 A.3d at 877 (citing cases).

[27] *Id.* (citing cases).

[28] *Zuckerberg II*, 262 A.3d at 1058 (citing *Aronson*, 473 A.2d 805 and *Rales*, 634 A.2d 927).

11

liability on any of the claims that are the subject of the litigation demand.[29]

"If the answer to any of the questions is 'yes' for at least half of the members of the demand board, then demand is excused as futile."[30] Although the *Zuckerberg* test displaced the prior tests from *Aronson* and *Rales*, cases properly applying *Aronson* and *Rales* remain good law.[31]

When Plaintiff filed this action, the Board comprised Paradise, Chafkin, Wakeford, and three directors who joined the Board after the Public Offering—Henry Hoffman, Alex Mandel, and Seth Schorr (the "Demand Board"). To adequately allege demand futility, Plaintiff must plead particularized facts creating reason to doubt that at least three of the six members of the Demand Board were incapable of impartially considering a demand.[32]

Plaintiff advances arguments under each prong of *Zuckerberg*.

## A.     Material Personal Benefit

Under prong one of the *Zuckerberg* test, a director is disabled for demand futility purposes if the director received a material personal benefit from the

---

[29] *Id.* at 1059 (quoting *Zuckerberg I*, 250 A.3d at 890).

[30] *Id.*

[31] *Id.* In 2023, the Court of Chancery amended its rules to reflect the Delaware Supreme Court's adoption of the *Zuckerberg* test and modernize the language and presentation of the Rules to bring them closer in style to the Federal Rules of Civil Procedure. *See In re: Amendments to Rules 7, 10, 17–25, and 171 of the Court of Chancery Rules, Sections, III, IV, and XVI* (Del. Ch. Sept. 25, 2023) (ORDER).

[32] *In re INFOUSA, Inc. S'holders Litig.*, 953 A.2d 963, 989–90 (Del. Ch. 2007) ("Plaintiffs must show that a majority—or in a case where there are an even number of directors, exactly half—of the board was incapable of considering demand.").

wrongdoing that was not shared equally with the stockholders.[33] Whether a benefit is material is a question of fact that takes into consideration the amount, the recipient's wealth, and the circumstances surrounding the benefit.

Plaintiff argues that Paradise, Chafkin, and Wakeford derived material personal benefits when they sold $202,418,764.04, $39,061,800.66, and $1,784,039.58 in stock, avoiding approximately $41 million, $8 million, and $360,000 in losses, respectively.[34] According to Plaintiff, it is reasonably conceivable that these amounts were material to each director rendering each incapable of impartially considering a pre-suit litigation demand challenging the sales.

Defendants advance two arguments in response. First, they argue that it is not enough in the *Brophy* context under *Zuckerberg* prong one to allege that a director obtained a material personal benefit from the challenged sale. According to Defendants, a plaintiff must also allege that the individual director acted on material nonpublic information when obtaining that benefit.[35] Second, Defendants argue that it is not reasonably conceivable that the sales were material in light of Paradise, Chafkin, and Wakeford's overall holdings in Skillz.[36]

---

[33] *Zuckerberg II*, 262 A.3d at 1058; *Rales*, 634 A.2d at 936.

[34] Compl. ¶¶ 33, 35, 40, 44–46. The figures as to Paradise and Wakeford include sales by their respective trusts.

[35] Dkt. 61 ("Defs.' Reply Br.") at 17–19.

[36] Dkt. 45 ("Defs.' Opening Br.") at 31; Defs.' Reply Br. at 13, 15–16.

Defendants base their first argument on *Guttman v. Huang*,[37] where the court stated that it would be "unwise to formulate a common law rule that makes a director 'interested' whenever a derivative plaintiff cursorily alleges that he made sales of company stock in the market at a time when he possessed material, non-public information."[38] The court reasoned that such a rule would create a "hair-trigger demand excusal" inconsistent with the purpose of the demand requirement.[39] To avoid setting a bar for demand futility too low, the court held that a plaintiff must demonstrate that the director also faced a substantial likelihood of liability in connection with the *Brophy* claim.[40]

*Guttman*'s warning about cursory allegations is well-taken. And to render a director interested under prong one of *Zuckerberg*, the benefit received from those sales must be "material."[41] It thus remains true that a director is not interested "whenever a derivative plaintiff cursorily alleges that he made sales of company stock

---

[37] Defs.' Opening Brief at 25–26; Defs.' Reply Br. at 18–19 (citing *Guttman*, 823 A.2d 492 (Del. Ch. 2003)). Defendants also cite to *Tilden v. Cunningham*, 2018 WL 5307706 (Del. Ch. Oct. 26, 2018), and *Patel v. Duncan*, 2021 WL 4482157 (Del. Ch. Sept. 30, 2021), *as corrected* (Oct. 4, 2021), *aff'd*, 277 A.3d 1257 (Del. 2022). Defs.' Reply Br. at 18 ("Thus, Plaintiff must show that these Defendants received a benefit unique to them that is not shared by other stockholders, which under *Guttman*, *Tilden*, and *Patel* turns not on whether directors merely sold stock, but whether they sold stock based on material nonpublic information, which, after all, is at the heart of *Brophy*.") (emphasis omitted). But *Tilden* did not address whether directors were interested for demand futility purposes due to profits made from challenged trades. And *Patel* did not involve a *Brophy* claim.

[38] *Guttman*, 823 A.2d at 502.

[39] *Id.*

[40] *Id.*

[41] *See Zuckerberg II*, 262 A.3d at 1058.

in the market[.]"[42]  But it does not follow that a plaintiff also must establish liability based on misuse of material non-public information for prong one purposes.  A director's use of material non-public information factors into whether a director faces a substantial likelihood of liability under prong two of *Zuckerberg* as well as the Rule 12(b)(6) analysis.  It does not factor into the prong one analysis.

To the extent *Guttman* is read to foreclose the possibility that a material personal benefit alone may render a director interested as to a *Brophy* claim against that director, it is inconsistent with *Zuckerberg*.  As *Zuckerberg* recognizes, deriving a material personal benefit from a transaction is sufficient to create reason to doubt whether a director could impartially consider litigation challenging that transaction.[43]

Plaintiff has adequately alleged that Paradise and Chafkin received a material personal benefit from the challenged stock sales.  Paradise and his trusts sold $202,418,764.04 worth of Skillz stock, and Chafkin sold $39,061,800.66 of Skillz stock.  The timing of these sales allegedly allowed them to make approximately $41 million and $8 million more, respectively, than if they had sold later.  It is reasonably

---

[42] *Guttman*, 823 A.2d at 502.

[43] *Zuckerberg II*, 262 A.3d at 1059.  The court rejected the same arguments that Defendants made based on *Guttman* in *Coinbase*.  *See Grabski on behalf of Coinbase Glob., Inc. v. Andreessen*, 2024 WL 390890, at *8–9 (Del. Ch. Feb. 1, 2024). Defendants did not cite *Coinbase* in their opening brief, although it is directly on point.  In their reply brief, Defendants argued that "had the amount of the massive stock sales alone been enough to excuse demand in *Coinbase,* this Court would have not proceeded to analyze substantial likelihood of liability[.]"  Defs.' Reply Br. at 20. But that is not a fair reading of *Coinbase*, which plainly states, at the end of the analysis of the material personal benefits, that "[d]emand is excused on this basis." 2024 WL 390890, at *9.

conceivable that those sums are material, rendering both Paradise and Chafkin incapable of impartially considering a demand.[44]

Defendants' second argument as to Wakeford, however, succeeds. Wakeford is exceedingly wealthy. Among other assets, he held approximately $54 million in Skillz stock at the time of the Public Offering.[45] He made only $360,000 more from the timing of the sales. It is not reasonable to infer that $360,000 is material to someone who counts approximately $54 million in Skillz stock among his assets.

## B. Substantial Likelihood Of Liability

Under prong two of the *Zuckerberg* test, a director is disabled for demand futility purposes if the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand.

Plaintiff alleges that each of the Demand Board members who approved the Public Offering—Paradise, Chafkin, and Wakeford—face a substantial likelihood of

---

[44] *See In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784, 813 (Del. Ch. 2022) ("A greater than half-million-dollar payout is presumptively material at the motion to dismiss stage."); *Orman v. Cullman*, 794 A.2d 5, 31 (Del. Ch. 2002) ("I think it would be naïve to say, as a matter of law, that $3.3 million is immaterial."); *see also Coinbase*, 2024 WL 390890, at *7 (observing that a presumptively material gain from challenged stock sale is sufficient to disable a director under the first prong of *Zuckerberg*).

[45] *See.* Defs.' Opening Br., Ex. 3 at 77–78 (Public Offering Registration Statement Prospectus). The Prospectus reflects that, at the time of the Public Offering, Wakeford held 1,682,655 shares of Skillz stock, and his trust held 608,804 shares. At the Public Offering price of $23.34, the shares were worth $53.5 million. Although this document is not referenced in the Complaint, the court takes judicial notice of its text, which cannot reasonably be disputed. *See Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *5 (Del.Ch. Dec. 22, 2010) ("[A] court may take judicial notice of the contents of an SEC filing, but only to the extent that the facts contained in them are not subject to reasonable dispute.").

16

liability on the *Brophy* claims against them. Having already concluded that demand is futile as to Paradise and Chafkin, the court focuses on Wakeford.

Because showing that a defendant faces a substantial likelihood of liability from a claim requires that the claim be legally viable, the Rule 23.1 analysis as to Wakeford effectively folds into the Rule 12(b)(6) analysis of the *Brophy* claim against him.[46]

"[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[47] When considering such a motion, the court must "accept all well-pleaded factual allegations in the [c]omplaint as true . . . , draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[48] The court, however, need not "accept conclusory allegations unsupported by specific facts or [] draw unreasonable inferences in favor of the non-moving party."[49]

To state a claim under *Brophy*, a plaintiff must plead that the defendants: (a) possessed material nonpublic information; and (b) used that information to make

---

[46] *See Coinbase*, 2024 WL 390890, at \*9 ("To plead a substantial likelihood of liability, a plaintiff must 'make a threshold showing, through the allegation of particularized facts, that their claims have some merit.'" (quoting *Rales*, 634 A.2d at 934)).

[47] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

[48] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[49] *Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

trades because the defendants were motivated by the substance of that information (the scienter requirement).[50]

Plaintiff's theory is that the Board (including Wakeford) received two pieces of non-public information during the March 4 Board meeting—one, positive and the other, negative. The negative information was that, based on the Company's actual performance through March 4, 2021, Skillz's 2021 revenue was projected to fall short of analysts' $366 million revenue expectation (i) by 8% if the actual January 2021 results were extrapolated to the full year 2021 and (ii) by 11% if the Company's Q1 2021 results were extrapolated to the full year 2021. The positive information related to Skillz's healthy 2020 financial results, including that the Company's revenue had grown to "$68 million during the fourth quarter of 2020, 8% higher than expectations, and up 95% compared with $35 million during the comparable quarter in 2019[.]"[51] According to Plaintiff, the Board broke up the announcements, planning the launch and pricing of the Public Offering to capitalize on the positive information and precede the negative information.[52]

Defendants dispute that the negative information identified by Plaintiff is material, but this decision does not reach that issue. To state a claim under *Brophy*, a plaintiff must allege not only that the defendant possessed material, nonpublic company information, but also that the defendant "used that information improperly

---

[50] *In re Oracle, Corp.*, 867 A.2d 904, 934 (Del. Ch. 2004); *see also Guttman*, 823 A.2d at 505.

[51] Compl. ¶ 2.

[52] *Id.* ¶ 64.

by making trades because she was motivated, in whole or in part, by the substance of that information."[53] The court considers a variety of factors when evaluating whether a plaintiff has adequately alleged scienter, including timing,[54] the overall and relative size of the trades,[55] and inconsistency with the defendant's historic trading patterns.[56]

Plaintiff's arguments as to scienter focus on the timing and size of the trades.[57] The timing of the trades is suspicious. Why stage announcements of the positive and negative news learned at the same Board meeting? Why schedule the Public Offering to occur during a blackout window under the Policy, unless to capitalize on any

---

[53] *Oracle*, 867 A.2d at 934.

[54] *See In re Clovis Oncology, Inc. Deriv. Litig.*, 2019 WL 4850188, at *15 (Del. Ch. Oct. 1, 2019) ("[T]he fact a fiduciary sells stock near the time he learns of material, nonpublic information might be evidence of the seller's motive[.]"); *Guttman*, 823 A.2d at 504 (identifying the expiration date for any options or restrictions like lockups as relevant to the scienter analysis).

[55] *Guttman*, 823 A.2d at 504 (identifying as a factor the size of the trades relative to the defendant's overall stock holdings); *see also Oracle*, 867 A.2d at 954 (noting that a defendant's challenged stock sales "generated nearly a billion dollars in proceeds even though they involved only 2% of his [company] shares").

[56] *See Clovis*, 2019 WL 4850188, at *16 ("Noticeably absent from the [c]omplaint are any well-pled facts that the trades at issue represented a deviation from the sellers' past trading practices."); *Rattner v. Bidzos*, 2003 WL 22284323, at *12 (Del. Ch. Sept. 30, 2003) ("[T]he [a]mended [c]omplaint does not assist in determining whether the pattern of executed trades was the product of an orchestrated scheme to defraud the market and the [c]ompany's shareholders or good faith adherence to [c]ompany policy or consistent with prior individual practices."); *Guttman*, 823 A.2d at 503–04 (declining to draw an inference of scienter from the allegation that challenged trades were unusually timed where the complaint "fail[ed] to specify what trades, if any, [the defendant] directors made in [the] prior year" and noting that "[t]he prior year measure in itself is a weak one, covering as it does a temporally brief period").

[57] Pl.'s Answering Br. at 38–40.

19

positive effects from announcement of positive news and avoid the negative effects of the later announcement? This concern is presumably why the Policy restricts trading in the period shortly before a quarter ends and before that quarter's financial results are released.

Yet as to Wakeford, it is hard to conclude that timing motivated him. Timing made him $360,000 more than he would have otherwise made in a later sale. The $360,000 sum is far from the eyebrow-raising amounts that, in *Coinbase*, supported an inference of scienter.[58] In essence, Plaintiff urges the court to infer a person of considerable wealth—$54 million in Skillz stock alone—was motivated to risk the reputational harm associated with fiduciary breaches to earn a few hundred thousand more dollars than he might have otherwise. This is not reasonable. Wakeford does not face a substantial threat of liability from the *Brophy* claim against him. [59]

---

[58] *See Coinbase*, 2024 WL 390890, at *11.

[59] In a version of this point, Defendants focus on the size of the stock sale relative to the director's overall stock holdings. Defs.' Opening Br. at 31; Defs.' Reply Br. at 15–16. They cite to Vice Chancellor Slights' wisdom in *Clovis*, that "[i]f a defendant sells only a small portion of her holdings and retains a huge stake in the company, then it is difficult reasonably to infer she was fleeing disaster or seeking to make an unfair buck." 2019 WL 4850188, at *15 (quoting *Oracle*, 867 A.2d at 954) (cleaned up). True enough. There are limits to this logic, of course—talented fraudsters know that "hogs get slaughtered," and that small or incremental gains are more likely to avoid detection. And if a defendant makes material amounts of money based on the timing of the sale, then the relative size of the sale compared to their overall holdings matters less. *See Coinbase*, 2024 WL 390890, at *11 (rejecting the argument that the defendants "must have sold a larger proportion of their holdings to give rise to a pleadings-stage inference of scienter").

## C.  Lack Of Independence

Under prong three of the *Zuckerberg* test, a director is disabled for demand futility purposes if the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.

Plaintiff alleges that Hoffman lacks independence from Chafkin and Paradise, and that Chafkin and Schorr lack independence from Paradise.  Having already concluded that demand is futile as to Chafkin, the court focuses on Hoffman and Schorr.

"A plaintiff may establish that a director lacks independence by alleging with particularity that the director 'is sufficiently loyal to, beholden to, or otherwise influenced by an interested party to undermine the director's ability to judge the matter on its merits.'"[60]  For any given director, the independence inquiry turns on "whether the plaintiffs have pled facts from which the director's ability to act impartially on a matter important to the interested party can be doubted because that director may feel either subject to the interested party's dominion or beholden to that interested party."[61]

---

[60] *In re Oracle Corp. Deriv. Litig.*, 2018 WL 1381331, at *15 (Del. Ch. Mar. 19, 2018) (quoting *Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *26 (Del. Ch. Apr. 14, 2017)).

[61] *Sandys v. Pincus*, 152 A.3d 124, 128 (Del. 2016) (quoting *Del. Cty. Emps. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1024 n.25 (Del. 2015) (internal quotation marks omitted).

A plaintiff need not plead evidence or facts sufficient to support a judicial inference that a defendant lacks independence. "A plaintiff is only required to plead facts supporting an inference—or in the words of *Rales*, 'create a reasonable doubt'— that a director cannot act impartially."[62] Reasonable doubt as to the director's independence may be found where a director's decision is based on "extraneous considerations or influences" rather than the "corporate merits of the subject before the board."[63]

As to Hoffman, Plaintiff alleges that Chafkin and Hoffman have been friends for over a decade.[64] The two were among the couple hundred students who studied economics as members of the Duke University class of 2006.[65] And Hoffman or his wife have interacted with both Paradise and Chafkin on social media on occasion.[66] These are interesting and particularized allegations. But they are the sort of insignificant social interactions that this court has previously deemed insufficient to compromise a director's independence.[67] Plaintiff has not adequately alleged that that Hoffman was beholden to Chafkin or Paradise.

---

[62] *Id.* at 130.

[63] *Aronson*, 473 A.2d at 816.

[64] Compl. ¶ 117.

[65] *Id.*

[66] Compl. ¶¶ 118–121.

[67] *See Zuckerberg II*, 262 A.3d at 1063 (noting that a complaint did not raise a reasonable doubt of a director's independence where it alleged the director and interested party had financial ties, and that the interested party was the director's "close friend and mentor"); *Patel*, 2021 WL 4482157, at *20 (finding allegations that a director and interested party attended the same college, "earned the same degree," were both honored by the university as alumni, and "both made six-figure donations"

As to Schorr, Plaintiff anchors her allegations on a business relationship that Schorr disclosed on his director and officer questionnaire. In the questionnaire, Schorr answered "yes" to a question asking whether he holds "at least a 5% ownership interest" in a company to which Skillz "made in the . . . current or previous taxable year," or "is . . . now contractually obligated to make . . . payments for goods or services[.]"[68] Based on research in the public domain, Plaintiff alleges that Schorr is a founding partner of and owns more than 5% of GMA Consulting and that the GMA website identifies Skillz as a client. This allegation is significant for the present analysis because Paradise, as CEO and controller,[69] inferably has the power to

---

to the university insufficient to support an inference that the director lacked independence); *Khanna v. McMinn*, 2006 WL 1388744, at *19 (Del. Ch. May 9, 2006) (finding allegations that an interested party and director were "long-time friend[s]" and "both own homes in the same neighborhood" insufficient to support an inference that the director lacked independence); *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 980–81 (Del. Ch. 2000) (rejecting the inference that one director "dominated and controlled" another despite the plaintiffs' allegations that the two had a "long-standing 15-year professional and personal relationship").

[68] Compl., Ex. 8 at 21.

[69] Plaintiff also seems to suggest that, even absent the GMA relationship, Schorr could not be independent from Paradise given Paradise's status as a controller. *See* Pl.'s Answering Br. at 44–45. The presence of a controller is an important factor in an independence analysis. *See In re BGC P'rs, Inc.*, 2019 WL 4745121, at *10 (Del. Ch. Sept. 30, 2019) (noting that a controller's presence is an "important factor" in a thorough analysis of independence but not holding it is dispositive; *Oracle*, 824 A.2d at 941 (noting, in the context of a *Zapata* determination, that independence must be evaluated "contextually"). And in each of the cases Plaintiff cites, the court noted that the presence of a controller provides context when examining a director's independence. *See* Pl.'s Answering Br. at 45 n.130 (first citing *BGC*, 2019 WL 4745121, at *8; and then quoting *Oracle*, 824 A.2d at 940). But serving on the board of a controlled company alone is not enough to impugn a director's independence from a controller. *See In re GoPro, Inc.*, 2020 WL 2036602, at *11 (Del. Ch. Apr. 28, 2020) ("It is well-settled that a controlling stockholder's voting power and 'selection' of directors do not, without more, render directors 'beholden' to the controller." (quoting *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1054

23

terminate GMA's relationship with Skillz.[70]  If GMA's business relationship with Skillz is material to Schorr, then there is reason to doubt his independence from Paradise.

Weighing in favor of the inferences Plaintiff seeks are: Schorr's disclosure on the D&O questionnaire; GMA's inclusion of the relationship on its website; and the fact that both GMA and Skillz are Las Vegas-based companies focused on the gaming industry.  Then again, given the wording of the questionnaire, merely disclosing the GMA contract does not establish that it is a contract "so material as to taint" Schorr's judgment.[71]  And the Complaint contains no allegations concerning the precise value of any Skillz contract to GMA or Schorr.

The parties dispute why Plaintiff failed to plead facts concerning the value of the Skillz contract to GMA.  Plaintiff says that she has no other details concerning

---

(Del. 2004)) (cleaned up)); *Beam*, 845 A.2d at 1054 (Even in the face of "overwhelming voting control[,] . . . [a] stockholder's control of a corporation does not excuse presuit demand on the board without particularized allegations of relationships between the directors and the controlling stockholder demonstrating that the directors are beholden to the stockholder."); *Aronson*, 473 A.2d at 815 ("[I]n the demand context even proof of majority ownership of a company does not strip the directors of the presumptions of independence, and that their acts have been taken in good faith and in the best interests of the corporation.  There must be coupled with the allegation of control such facts as would demonstrate that through personal or other relationships the directors are beholden to the controlling person.").

[70] Plaintiff also alleges that Schorr lives in the same high-end gated community in Las Vegas as Paradise.  Compl. ¶ 115.  This is the sort of social relationship that, standing alone, is not enough to impugn a director's independence.  *See supra* n.67.  That said, it could tip the balance when evaluating the reasonableness of an inference against Schorr's independence if the allegations concerning GMA carry weight.

[71] *See White v. Panic*, 793 A.2d 356, 366 (Del. Ch. 2000), *aff'd*, 783 A.2d 543 (Del. 2001).

the relationship between GMA and Skillz because the Company withheld information on this topic during Plaintiff's pre-suit investigation.[72]  Plaintiff contends that Skillz's withholding of information during the pre-suit investigation concerning GMA warrants a plaintiff-friendly inference.[73]  And Plaintiff argues that it would be fundamentally unfair to require Plaintiff to plead facts to which it has no access.[74]

Defendants respond that Plaintiff lacks information about the GMA contract because none exists.  They reference correspondence from defense counsel representing that they located no agreement between GMA and Skillz after a reasonably diligent search.[75]  But accepting defense counsel's representation at face value would be inconsistent with how pleading-stage inferences are intended to

---

[72] When Plaintiff inquired into the relationship between Skillz and GMA, counsel for Defendants responded that Skillz was "not aware of any contracts or financial agreements" with GMA Consulting, and that to the extent Plaintiff was referring to the fact that GMA identifies Skillz as a client on its website, Plaintiff should "ask GMA" because Skillz is unaware of any contracts or financial agreements with GMA. Compl. ¶ 114; *see* Compl., Ex. 7 at 5.

[73] *See* Pl.'s Answering Br. at 44 & n.128 (citing *In re Tyson Foods, Inc. Consol. S'holder Deriv. Litig.*, 919 A.2d 563, 578 (Del. Ch. 2007) ("[I]t is more reasonable to infer that exculpatory documents would be provided [in response to a Section 220 demand] than to believe the opposite: that such documents existed and yet were inexplicably withheld.")).

[74] Pl.'s Answering Br. at 41–42 (quoting *In re Facebook, Inc. Deriv. Litig.*, Consol. 2018-0307-JTL, at 32 (Del. Ch. May 10, 2023) (TRANSCRIPT) ("It would be fundamentally unfair to make a pleading stage determination turn on information that the plaintiffs simply cannot obtain.")).

[75] Defs.' Opening Br. at 38; Compl., Ex. 7 at 3 ("[W]e have confirmed with Skillz personnel . . . that no agreements (including with GMA Consulting) have been located in the Company's books and records maintained in the ordinary course after a reasonably diligent search . . . ."); *id.* at 1 ("[I]ndividuals at Skillz and GMA . . . can confirm that there is no agreement between GMA and Skillz.").

work.[76] Plus, the representations raise questions. If there is no contract, what is the basis of the representations on Schorr's D&O questionnaire and GMA's website?

It is tempting to do as Plaintiff asks, give Plaintiff the benefit of the inference in light of the unusual circumstances surrounding this issue, and deny the Rule 23.1 motion. But there is another option, which is potentially more palatable to Defendants. "Generally, matters outside the pleadings should not be considered in ruling on a motion to dismiss."[77] When a party presents matters outside of the pleadings, the court may convert the dismissal-stage motion into one for summary judgment.[78] Defendants' reliance on the truth of the matters asserted in its correspondence to Plaintiff warrants converting their Rule 23.1 motion into a motion for summary judgment on the discrete issue implicated, and allowing discovery into the limited question of Schorr's independence.

## III.    CONCLUSION

The Rule 23.1 motion is converted into a motion under Rule 56 for the limited purposes described above. Because the Rule 56 motion has the potential to resolve the Rule 12(b)(6) motion, the court stays consideration of the Rule 12(b)(6) motion.

---

[76] The correspondence was attached to the Complaint and can be fairly cited for limited propositions—for example, that the parties corresponded on these issues. But at the pleading stage, the court cannot weigh defense counsel's representations in the correspondence against plaintiff-friendly inferences.

[77] *Santa Fe*, 669 A.2d at 68.

[78] *See In re McDonald's Corp. S'holder Deriv. Litig.*, 291 A.3d 652, 699–700 (Del. Ch. 2023) ("Demand futility can be analyzed on summary judgment, and a court can convert a motion to dismiss into a motion for summary judgment to facilitate analysis.").